# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IRONWORKERS DISTRICT COUNCIL OF PHILADELPHIA & VICINITY RETIREMENT & PENSION PLAN,

                Plaintiff,

v.

LAMBERTO ANDREOTTI, BART BAUDLER, JOHN BEDBROOK, SAMUEL W. BODMAN, JAMES BOREL, RICHARD H. BROWN, ROBERT A. BROWN, DENNIS BYRON, BERTRAND P. COLLOMB, THOMAS M. CONNELLY, DANIEL J. COSGROVE, CURTIS J. CRAWFORD, ALEXANDER M. CUTLER, JOHN T. DILLON, ELEUTHERE I. DU PONT, ERIK FYRWALD, MARILLYN A. HEWSON, CHARLES O. HOLLIDAY, ROBERT C. IWIG, DANIEL E. JACOBI, LOIS D. JULIBER, JEFFREY L. KEEFER, ELLEN KULLMAN, MICHAEL LASSNER, TRACY LINBO, CARL J. LUKACH, JUDITH MCKAY, WILLIAM NIEBUR, DEAN OESTREICH, WILLIAM K. REILLY, THOMAS L. SAGER, PAUL SCHICKLER, JOHN SOPER, LEE M. THOMAS, PATRICK J. WARD,

                Defendants,

and E. I. DU PONT DE NEMOURS AND COMPANY,

                Nominal Defendant.

C.A. No.9714-VCG

## MEMORANDUM OPINION

Date Submitted: February 10, 2015
Date Decided: May 8, 2015

Joanne P. Pinckney, Elizabeth Wilburn Joyce, and Seton C. Mangine, of PINCKNEY, WEIDINGER, URBAN & JOYCE LLC, Wilmington, Delaware; OF COUNSEL: John Bradham, Nicholas Brunero, and Peter B. Katzman, of MAZZEO SONG & BRADHAM LLP, New York, New York; Ariana J. Tadler, Kent A. Bronson, and Gloria Kui Melwani, of MILBERG LLP, New York, New York; Jacob A. Goldberg and Alessandra C. Phillips, of COHEN, PLACITELLA & ROTH, PC, Philadelphia, Pennsylvania, *Attorneys for Plaintiff Ironworkers District Council of Philadelphia & Vicinity Retirement & Pension Plan.*

Lewis H. Lazarus, Joseph R. Slights, III, and Thomas E. Hanson, Jr., of MORRIS JAMES LLP, Wilmington, Delaware; OF COUNSEL: Evan R. Chesler, of CRAVATH, SWAINE & MOORE LLP, New York, New York, *Attorneys for Defendants Ellen Kullman and Thomas L. Sager.*

Michael P. Kelly, Andrew S. Dupre, and Daniel J. Brown, of MCCARTER & ENGLISH, LLP, Wilmington, Delaware; OF COUNSEL: Donald Scott and Brian C. Swanson, of BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP, Chicago, Illinois, *Attorneys for Defendants Bart Baudler, John Bedbrook, James Borel, Dennis Byron, Thomas M. Connelly, Daniel J. Cosgrove, Erik Fyrwald, Robert C. Iwig, Daniel E. Jacobi, Jeffrey L. Keefer, Michael Lassner, Tracy Linbo, Carl J. Lukach, Judith McKay, William Niebur, Dean Oestreich, Paul Schickler, and John Soper.*

Kevin G. Abrams, of ABRAMS & BAYLISS LLP, Wilmington, Delaware, *Attorneys for Defendants Lamberto Andreotti, Samuel W. Bodman, Richard H. Brown, Robert A. Brown, Bertrand P. Collomb, Curtis J. Crawford, Alexander M. Cutler, John T. Dillon, Eleuthere I. du Pont, Marillyn A. Hewson, Charles O. Holliday, Lois D. Juliber, William K. Reilly, Lee M. Thomas, and Patrick J. Ward*; OF COUNSEL: David E. Kendall, Douglas R. Marvin, and Ana C. Reyes, of WILLIAMS & CONNOLLY LLP, Washington, D.C., *Attorneys for Defendants Lamberto Andreotti, Richard H. Brown, Robert A. Brown, Bertrand P. Collomb, Curtis J. Crawford, Alexander M. Cutler, Eleuthere I. du Pont, Marillyn A. Hewson, Lois D. Juliber, Lee M. Thomas, and Patrick J. Ward*; Charles Bachman and Edward N. Moss, of O'MELVENY & MYERS LLP, New York, New York, *Attorneys for Defendants Samuel W. Bodman, John T. Dillon, Charles O. Holliday,*

*and William K. Reilly.*

Donald J. Wolfe, Jr. and Michael A. Pittenger, of POTTER ANDERSON CORROON LLP, Wilmington, Delaware; Edward P. Welch, of SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; OF COUNSEL: Thomas J. Nolan and Allen L. Lanstra, of SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Los Angeles, California, *Attorneys for Nominal Defendant E. I. du Pont de Nemours and Company.*

**GLASSCOCK, Vice Chancellor**

The Plaintiff's Verified Amended Derivative Complaint (the "Complaint") seeks recovery on behalf of E. I. du Pont de Nemours and Company ("DuPont" or the "Company").[1] The dispute centers on the attempt by DuPont and its wholly-owned subsidiary and seed unit Pioneer Hi-Bred International, Inc. ("Pioneer") to develop a product to compete with Monsanto Company's ("Monsanto") genetically modified seed—a trait known as "Roundup Ready"—which allows beneficial crops to thrive under application of Monsanto's well-known herbicide, Roundup. Under a 2002 license agreement, DuPont and Pioneer had access to Monsanto's Roundup Ready technology for corn and soybeans. If DuPont could develop its own competitor to Roundup Ready, it would avoid significant license fees under the agreement. In the mid-2000s, DuPont began development of that competitive product, which it called "Optimum GAT" or "GAT."

DuPont found, however, a commercially viable GAT difficult to produce. As field trials of GAT continued to be disappointing, DuPont began development of a product that combined, or "stacked," GAT technology with Monsanto's Roundup Ready (the "GAT/RR Stack"). During the development of this product, some DuPont and Monsanto employees believed that commercialization of the stacked product would violate the licensing agreement; nonetheless, development

---

[1] Unless otherwise specified, all facts are taken from the Complaint and documents incorporated by reference therein. Where indicated, some facts are taken from the Report of the Evaluation Committee of the Board of Directors of E. I. du Pont de Nemours and Company, which is cited in the Complaint.

continued. Meanwhile, DuPont continued to tout GAT as a potentially-viable and profitable product.

When negotiations between the parties involving the GAT/RR Stack and other licensing issues broke down, Monsanto sued DuPont in federal district court in the Eastern District of Missouri alleging, essentially, breach of the licensing agreement and patent infringement claims. DuPont defended on the ground that the agreement either permitted stacking or should be reformed, and counterclaimed alleging antitrust claims against Monsanto. The resulting litigation, as described in the Complaint and in detail below, proved disastrous to DuPont. The district court found that DuPont's defense—that it had the ability to stack under the 2002 licensing agreement—was not only incorrect but that it was based on fabrication and worked a fraud on the court. As sanctions, it struck DuPont's reformation defense and counterclaims, and awarded attorneys' fees (the "Sanctions Order"). Monsanto's patent infringement claims were then tried to a jury. Despite the fact that DuPont had never sold any of the stacked product, the jury found damages due to Monsanto in the amount of *$1.2 billion*. DuPont decided it would appeal both the Sanctions Order and the damages award.

During the pendency of post-trial proceedings, the parties reached a settlement. The parties entered into a new agreement allowing DuPont to use the Roundup Ready technology, including, when available in 2018, use of a new,

2

presumably improved version of Roundup Ready then in development, a right not conveyed by the superseded 2002 licensing agreement. Monsanto agreed to forgo the jury verdict, and DuPont released its antitrust claims. Finally, DuPont agreed to pay Monsanto $1.75 billion over ten years. The Sanctions Order remained on appeal and was not addressed by the settlement.

On appeal, the circuit court affirmed the Sanctions Order in part, finding that DuPont had litigated in bad faith, but reversed as to the determination that it had worked a fraud on the Court. DuPont remained liable for certain of Monsanto's attorneys' fees, as a sanction.

Following the litigation, several stockholders, including the Plaintiff here, made demands on DuPont's board of directors (the "Board") to investigate and consider suit against several officers and Board members of DuPont and Pioneer in connection with the development of GAT, the decision to stack, and the conduct of the Monsanto lawsuit, alleging breaches of fiduciary duties. The Board formed a special committee, comprised of directors who had joined the Board after the relevant timeframe at issue (the "Committee"), and the Committee conducted a detailed investigation of the subjects of the demands, as set forth in a 179-page report (the "Report"), and determined that a suit against officers and directors was not in the best interest of DuPont. The DuPont Board adopted the recommendation of the Committee, and rejected the stockholders' demands. Despite the Board's

3

determination not to pursue litigation, the Plaintiff seeks to prosecute such actions here.

A stockholder whose demand has been rejected but who nonetheless seeks to bring an action arising out of the subject matter of the demand has two pleading burdens. First, she must allege facts which, if true, are sufficient to state a claim against the defendants. Second, to have standing to sue derivatively, under Court of Chancery Rule 23.1 she must allege with particularity facts that raise a reasonable doubt that in refusing the demand the directors complied with their fiduciary duties. DuPont has moved to dismiss under Rule 23.1; for the following reasons, that Motion is granted.

## I. BACKGROUND FACTS

The casual reader may find the following discussion of the facts wearisome. Its length is in part explained by the dual pleading burden addressed above, in part because of the complexity of the underlying factual scenario (including the development of a genetically-modified seed by DuPont and the resultant patent/contract litigation in federal district court with Monsanto), in part because the demands and resulting complaint in this litigation focus on an unusually large number of allegedly actionable decisions or failures to act by the defendants over a period of years, and in part because of the unusually detailed investigation and

4

resulting Report by the Committee of independent directors appointed by the DuPont board in response to the demands.[2]

*A. Parties*

The Plaintiff alleges breaches of fiduciary duties by DuPont's Board, certain DuPont officers and employees, as well certain employees of Pioneer, arising out of litigation with Monsanto, including the events leading to the litigation, conduct during the litigation, and events following the litigation.

The Complaint names twelve current and four former DuPont directors as defendants: Lamberto Andreotti, Richard. H. Brown, Robert A. Brown, Bertrand P. Collomb, Curtis J. Crawford, Alexander M. Cutler, Eleuthere I. du Pont, Marillyn A. Hewson, Lois D. Juliber, Ellen Kullman, Lee M. Thomas, and Patrick J. Ward (collectively, the "Current Director Defendants"); and Samuel W. Bodman, John T. Dillon, Charles O. Holliday, and William K. Reilly (collectively, the "Former Director Defendants," and, together with the Current Director Defendants, the "Director Defendants").

Additionally named individual defendants are[3]: Bart Baudler, a Senior Marketing Manager who was involved with the GAT project since its inception, "served as the Optimum GAT trait champion for the Company," was a GAT Core

---

[2] Of course, the reader is entitled to blame the prolixity of the writer of this Memorandum Opinion, as well.

[3] All defendants are DuPont employees or directors unless otherwise indicated. All titles are as stated in the Complaint.

Team Member, and "led soybean marketing efforts for Pioneer";[4] John Bedbrook, Vice President of Agricultural Biotechnology, former-Vice President of Research and Development, and a Senior Leader; James Borel, an Executive Vice President identified as a member of the Office of the Chief Executive and designated in the McKinsey Report as "DuPont leadership;" Dennis F. Byron, a Vice President of Crop Product Development at Pioneer; Thomas M. Connelly, an Executive Vice President and the Company's Chief Innovation Officer, as well as a member of the Office of the Chief Executive; Daniel J. Cosgrove, Vice President of Business Development, and former-Corporate Counsel for Pioneer, and former-IP Group Leader/Corporate Counsel; Erik Fyrwald, former-Group Vice President of Agriculture and Nutrition at DuPont and a Senior Leader; Robert C. Iwig, former-Vice President of Business Development/Trait Licensing at Pioneer, a Senior Leader, and a member of the Soybean Herbicide Tolerance Working Team; Daniel E. Jacobi, former-Corporate Legal Counsel for Pioneer, then the Associate General Counsel for DuPont Agriculture and Nutrition; Jeffrey L. Keefer, former Executive Vice President of DuPont; Michael Lassner, Vice President of Trait Discovery; Traci Linbo, Director of Business and Strategy Planning at DuPont Pioneer for

---

[4] Am. Compl. ¶ 52. The Complaint refers to a 2007 report by consulting firm McKinsey & Company (the "McKinsey Report"), which identified certain Company employees as "Senior Leaders" or among "Senior Leadership." Other employees were part of the "GAT Core Team," which the Complaint alleges was "responsible for oversight, marketing and messaging regarding GAT." *See id.* at 18 n.4. The Complaint also notes that, according to the Company's bylaws, executive vice presidents and vice presidents are officers of the Company. *Id.*

Asia, China, Europe, and Africa, former-Senior Marketing Manager for the Optimum GAT trait at DuPont, and member of the GAT Core Team; Carl J. Lukach, President of DuPont East Asia and former-Vice President of Investor Relations for DuPont; Judith McKay, former-Chief Administrative Officer and General Counsel for DuPont Canada, and former-Vice President and General Counsel for Pioneer; William Niebur, Vice President and General Manager of DuPont Pioneer China, and a Senior Leader; Dean Oestreich, former-Vice President of DuPont, former-President of Pioneer, and former-Chairman of Pioneer, and also a Senior Leader; Thomas L. Sager, a former-Senior Vice President and General Counsel of DuPont, a former-Associate General Counsel, former-Chief Litigation Counsel, and a former-member of the Office of the Chief Executive; Paul Schickler, the President of Pioneer; John Soper, former-Vice President of Crop Genetics Research and Development for DuPont; and Ellen Kullman, named above as a Director Defendant, the Chief Executive Officer of DuPont (collectively, the "Officer/Employee Defendants").[5]    The Director

---

[5] The term "Officer/Employee Defendants" is used in the Complaint. Its imprecision is not unnoticed. Under Delaware law, an employee does not owe fiduciary duties to the corporation unless he is a "key managerial employee" subject to fundamental principles of agency law. *See, e.g., Sci. Accessories Corp. v. Summagraphics Corp.*, 425 A.2d 957, 962 (Del. 1980). But given the plaintiff-friendly standard on a motion to dismiss, I will accept the Plaintiff's characterization as true rather than consider whether each named defendant owed fiduciary duties by virtue of applicability of agency law principles, and will use the Plaintiff's term with its implication in mind.

7

Defendants, Officer/Employee Defendants, and the Nominal Defendant, DuPont, are together referred to as the "Defendants."

The Complaint asserts eight counts that can be roughly categorized as follows[6]: (1) the fiduciary duty claims based on the facts underlying the Monsanto litigation, as asserted in Count I;[7] (2) fiduciary duty claims based on failure to disclose information to the Board, as asserted in Counts II and III;[8] (3) various misrepresentation-type claims for communications regarding the Company's licensing rights from Monsanto and the nature of its GAT product, as asserted in Count IV, V, and VI;[9] (4) a waste claim for the costs associated with litigation against Monsanto, including the settlement, asserted in Count VII;[10] and (5) a *Caremark* claim alleging failure of control and risk oversight related to the facts underlying the litigation with Monsanto and the misrepresentation-type claims.[11] I will detail the factual basis for these claims in rough chronological order.

### B. *The Monsanto Arms Race and Development of GAT*

---

[6] Because this is before me on a motion to dismiss under Rule 23.1, my focus is not on deciding merits of the causes of action asserted in the Complaint. *See In re Sanchez Energy Derivative Litig.*, 2014 WL 6673895, at *4 (Del. Ch. Nov. 25, 2014) (discussing the differences, both theoretical and in terms of applicable standards, between a motion under Rule 12(b)(6) and one under Rule 23.1).

[7] Am. Compl. ¶¶ 323–29.

[8] *Id.* ¶¶ 330–38. I note that Count II is asserted in the alternative to Count I. The allegation is that *either* the Board knew about the facts underlying the Monsanto litigation, and thus breached its fiduciary duties by either sanctioning the conduct that resulted in litigation or by consciously failing to investigate such conduct, *or* the Officer/Employee Defendants failed to disclose these facts to the Board prior to May 15, 2009.

[9] *Id.* ¶¶ 339–56.

[10] *Id.* ¶¶ 357–62.

[11] *Id.* ¶¶ 363–66.

8

Agriculture is a large segment of the Company's business, accounting for approximately half of its research and development costs, and nearly a quarter of the Company's net sales in 2011. What follows is an only-slightly-abbreviated play-by-play of the Company's attempt to develop a competitor to Monsanto's Roundup Ready trait, including at least two related ongoing processes: the Company's development and marketing of its competitive trait (GAT, as discussed below), and, while that was ongoing and proving difficult, the Company's strategizing and planning for an alternative approach.

Monsanto's well-known glyphosate-based herbicide, Roundup, led to its development of a gene trait known as Roundup Ready ("RR"). RR alters seeds to create plants that are resistant to Roundup, so that the herbicide kills only unwanted plants, not the actual crops. In 2002, DuPont and Pioneer negotiated non-exclusive license agreements with Monsanto for the right to use the RR gene in soybean seeds (the "2002 License Agreement") and corn (together with the 2002 License Agreement, the "2002 License Agreements").[12] The Plaintiff alleges, and a federal district court judge found, that Section 2.09 of the 2002 License Agreements prohibited commercialization of "stacked" products—the practice of combining multiple gene traits—and that this was a prohibition known to, and in

---

[12] The agreement relating to soybeans is most relevant in this action, but the Complaint occasionally refers to both agreements. Unless referred to in the plural, any reference to the 2002 License Agreement refers to the agreement with respect to soybeans.

9

fact negotiated by, several of the Officer/Employee Defendants, which the Plaintiff contends includes Jacobi, Cosgrove, and Miller.[13] The Complaint alleges, for example, that on March 14, 2002, Jacobi circulated to Cosgrove and Miller, among others, a redline version of the soybean agreement which "ha[d] been modified to remove the [anti-]stacking provisions," a change that would have allowed stacking but was ultimately rejected and not reflected in the final agreement.[14]

Eventually concluding that its annual $100 million fees to Monsanto under the 2002 License Agreements were creating long-term financial disadvantages and hampering its ability to compete, the Company began to develop its own glyphosate-resistant gene trait, GAT, which would compete with RR and allow the Company to stop paying licensing fees. The Company thus began its "arms race" with Monsanto, endeavoring to push GAT to market in advance of Monsanto's anticipated release of Roundup Ready 2 ("RR2"), the second generation of the RR gene.[15]

On March 2, 2006, Oestreich, then-President of Pioneer, publicly announced GAT at a trade show. A press release that same day indicated GAT would be available in 2009 and described it as possessing "unsurpassed glyphosate

---

[13] Am. Compl. ¶¶ 94–99. *See, e.g., id.* ¶ 95 (quoting a March 26, 2002 email from Miller to Cosgrove in which Miller wrote, "By the way, I just found out that section 2.09 may be a problem. . . . Our 1992 agreement is not so restrictive and permits us to commercialize stacks so long as they still meet the Commercialize Tolerance definition. We need to get back to that language so we are not limited.").

[14] *Id.* ¶ 94.

[15] *Id.* ¶ 100.

tolerance" that would "allow for higher glyphosate application rates and a wider application window than other products currently available"—*i.e.*, Monsanto's RR.[16] DuPont's shares rose by $0.43 that day. In the months that followed, the Company began negotiating licensing agreements for GAT and informed investors that it could lead to an additional $200 million or more in annual revenue for the Company.

By June 2006, however, GAT field trials were already producing disappointing results by way of stunted growth. The trials and poor results continued into early 2007, but, as the Plaintiff alleges, the Company continued to represent GAT's superiority to the market and indicate that it was on track for commercial release in 2009.[17]

In August 2006, Monsanto acquired Delta & Pine Land ("Delta Pine"), a company with which DuPont had previously done business. Specifically, Delta Pine had agreed, just prior to the acquisition, to a license for use of GAT in cotton for a $21 million upfront payment to DuPont. About this time, DuPont launched its "Project Choice Initiative," which set out to "push back against Monsanto's anticompetitive behavior using legal, regulatory, and public relations resources."[18] Together, the acquisition of Delta Pine and the Project Choice Initiative "created a

---

[16] *Id.* ¶ 105.
[17] *See id.* ¶¶ 114–116.
[18] *Id.* ¶ 101.

11

large amount of animosity and distrust between Monsanto and the Company," which "colored the parties' interactions in subsequent years."[19]

Beginning in or around early July 2007, Pioneer began considering whether to stack GAT with RR, rather than continue moving forward with GAT as a stand-alone product. As the Complaint alleges, various groups comprised of Niebur, Cosgrove, Jacobi, Fyrwald, Bedbrook, Byron, and Oestreich discussed this matter on July 10, 2007, and Cosgrove, then-Corporate Counsel and IP Group Leader, stated that he was "of the opinion that you are free to create test crosses with [RR] and GAT and could start that immediately."[20] On July 13, Byron submitted a presentation to Soper, non-party Nita Seelinger,[21] non-party Daria Schmidt,[22] Foley, Stephens, "and others," which was later presented to then-CEO of the Company, Holliday. The presentation discussed poor testing, including "stunting and slight yellowing" as compared to Monsanto's RR product that lacked these side effects, and suggested the Company consider stacking GAT with RR.[23] The presentation was later sent to Fyrwald, Bedbrook, Lukach, and Niebur. In spite of

---

[19] *Id.* ¶ 102.

[20] *Id.* ¶ 119.

[21] Seelinger is the Director of Executive Plans and Business Planning with DuPont. *Id.* at 38 n.19.

[22] Schmidt was the head of the GAT Core Team and a Research Director for Trait Characterization and Development for Pioneer. "She was also on the Soybean Herbicide Tolerance Working Team. Prior to 2000, Schmidt was the Soybean Research Manager, the Oilseeds Technology Coordinator and the Director of Technology Integration/Associative Genetics for Oilseeds and Field Crops at Pioneer." *Id.* at 38 n.20.

[23] *Id.* ¶ 120.

12

the known difficulties, Fyrwald remained optimistic about GAT's future in a July 24, 2007 earnings call, stating that GAT would be "a huge drive of earnings improvement" for the Company and touting what would be the "outstanding performance" of GAT.[24]

In a meeting on August 27, 2007, Baudler, Byron, Soper, Iwig, Schmidt, Linbo, Seelinger, and non-party Tracy Willits[25] discussed the poor field test results and how to move toward a successful launch in spite of them. They also discussed a biweekly "review with Leadership," which included Oestreich, Fyrwald, and Bedbrook.[26] That same day, Seelinger asked Cosgrove "and others" about negotiating the right to commercialize an RR/GAT stack; Cosgrove forwarded the message to Jacobi, stating, "We might be able to really accelerate timelines if we can sell a stacked product of [RR] and GAT. Questionable whether we have the right to do so now."[27]

In September, upon receiving a question from Jacobi concerning the "current advice to R&D on stacking RR and [GAT] in beans," Cosgrove responded,

---

[24] *Id.* ¶ 121.

[25] Willits "was the Employee Communications Manager at Pioneer from October 2002 to May 2007, the Senior Communications Manager, NA Region from May 2007 to April 2011, the Senior Manager, Communications, America Group from April 2011 to May 2013, and is currently the North American Communications Manager." Willits was also on the Soybean Herbicide Tolerance Working team and was a member of the GAT Core Team. *Id.* at 45 n. 23.

[26] *Id.* ¶ 124.

[27] *Id.* ¶ 125.

13

"Current: they can stack but no commercial rights."[28]  Meanwhile, an October 16, 2007 report circulated by Seelinger to Oestreich, Niebur, Schickler, Willits, Iwig, Soper, Linbo, and Byron indicated that only 1–2% of GAT crops met the Company's quality standards.  The next day, however, the Company issued a press release reiterating that it was on track to introduce GAT in soybeans by 2009 and that GAT would "offer[] growers expanded choices for controlling a broad spectrum of weeds through both glyphosate and ALS herbicide tolerance."[29]  That release did not mention stacking GAT with RR.

In a December 19, 2007 meeting, Byron, Lassner, Schmidt, Cosgrove, and Foley discussed whether the Company should "[b]ite the bullet and take the hit to walk away from [GAT];" whether the Company should "blame the government— could be to our advantage for time;" or "admit it is not ready for release—protect our brand name;" whether the Company should "[b]ack off promotion to decrease [the] public's expectations;" and whether stacking GAT with RR would produce a "reward worth the cost."[30]

By the end of 2007, the research team was recommending against continuing to pursue GAT as a stand-alone product.[31]  Throughout this process, regular reports

---

[28] *Id.* ¶ 127.
[29] *Id.* ¶ 129.
[30] *Id.* ¶ 130.
[31] *See id.* ¶ 131.

were provided to senior employees and by January 2008, according to the Complaint,

> "upper management," including Fyrwald, Schickler, Oestreich, Niebur, Bedbrook, Ross, Seelinger, Lassner, Jacobi, Cosgrove, Soper and Iwig concluded internally that the Company had to officially abandon GAT as a stand-alone product and to instead pursue stacking GAT with RR, despite the fact that they knew the Company was not permitted to commercialize such a product pursuant to the 2002 License Agreement with Monsanto (as Cosgrove and Jacobi had expressly recognized).[32]

The decision to pursue the GAT/RR Stack was, the Plaintiff contends, intended to conceal the problems with GAT as a stand-alone product;[33] problems were continuing to become apparent in mid- to late-January and certain employees recognized that a failure to bring GAT to market would place the Company at "significant competitive risk."[34] It was around this time that the Company began using the term "GRS" to refer to the GAT/RR Stack internally, while continuing to publicly promote "GAT," which was used interchangeably for either the GAT stand-alone product or the GAT/RR Stack.[35]

As the Company continued to move forward, on January 19, 2008, Bedbrook and Fyrwald discussed whether they had stacking rights; upon Fyrwald's

---

[32] *Id.* ¶ 134.

[33] *See id.* ¶ 126. The Plaintiff also contends that the Company wished to protect its historically strong market share in corn, which had been slipping to Monsanto; that is, it wanted to "guard against competitors using soybeans [*i.e.,* RR products] to gain access to our corn customers." *Id.* *See also id.* ¶ 135.

[34] *Id.* ¶ 138; *see also id.* ¶ 136.

[35] *Id.* ¶ 135.

15

suggestion that Bedbrook confirm with Cosgrove, Bedbrook reported back, "[W]e don't have commercial rights."[36] Between January 22 and January 24, 2008, Soper, Stephens, Schmidt, Lassner, Seelinger, Linbo, and others engaged in a planning session which included "extensive" discussions of GAT, including talk of "negotiations with Monsanto for stacking with RR."[37] The group also prepared for an upcoming presentation of the Soybean Research Leadership Team at which it would recommend "discontinu[ing] product development for [GAT] alone and transition[ing] toward a stacking strategy."[38] It recognized the need to "evaluate legal implications."[39]

Around this time, on January 26, 2008, emails between non-party Frank Ross,[40] Niebur, Bedbrook, and Schickler show discussions of efforts to counter rumors that GAT was performing poorly in the field. That same day, a series of emails show that the Soybean Research Leadership Team was recommending "discontinuation of GAT-only product evaluation" and a "rapid transition of breeding efforts toward a stack of GAT with an alternate glyphosate tolerance gene, if possible."[41] Lassner, Vice President of Trait Discovery for the Company, responded, "I agree with killing [GAT] as a stand alone product for beans" but

---

[36] *Id.* ¶ 139.
[37] *Id.* ¶ 141.
[38] *Id.* ¶ 142.
[39] *Id.*
[40] Ross was Pioneer's Vice President and Regional Director, North America. *Id.* ¶ 143.
[41] *Id.* ¶ 144.

16

noted his objection to ceasing regulatory approval efforts, as a stacked product would still require regulatory approval.[42]

In a January 28, 2008 meeting including Soper, Iwig, Jacobi, Bedbrook, Seelinger, Fyrwald, Schickler, Niebur, Oestreich, Ross, Cosgrove, Lassner, and others, the Soybean Research Leadership Team made its recommendation, "[b]ased on the off season trial results and given the current situation," to transition from developing stand-alone GAT products to a stacked product; the team also recognized the need to "negotiate access to an alternate glyphosate tolerance source for stacking."[43] Thus, the Plaintiff contends that "the Officer/Employee Defendants knew that DuPont could not commercialize the GAT/RR Stack without Monsanto's approval" as of January 28, 2008.[44]

That same day, Cosgrove, counsel for the Company, emailed Jacobi and said that the 2002 License Agreement, specifically Section 2.09, "seems to limit the ability to stack GAT plus RR," and that "[a] conservative reading says we can stack but may not be able to commercialize, a potentially useless right."[45]

As presented in its internal 2008 Annual Report for Soybean Product Development and Supporting Projects, a "consensus on a new path was reached with upper management in January of 2008" in which "[p]lans to introduce

---

[42] *Id.*
[43] *Id.* ¶ 146.
[44] *Id.*
[45] *Id.* ¶ 148.

17

Optimum GAT-only products were discontinued."[46] Trials on the GAT/RR Stack began quickly thereafter. The Plaintiff contends, based on this report and the aforementioned meetings, that the Company stopped pursuing GAT as a stand-alone product in January of 2008.[47]

Nonetheless, in a February 11, 2008 email, Ross, who was then-Vice President of the Company's North America division, informed North America operations employees that Fyrwald would be making a presentation on GAT at the Goldman Sachs Agricultural Bio Forum, reiterated the Company's "excite[ment] about the potential Optimum GAT presents to our business," and noted its "new approach" for GAT involving a "combination of technologies," in reference to combining GAT with a non-trait technology; Ross did not mention the GAT/RR trait combination.[48] In this email, Ross also included a Q&A on GAT as "a guide to help you answer questions," the answers for which were "not forthcoming and highly deceptive," according to the Plaintiff.[49] The same day, Soper emailed Willits and Seelinger, both Company scientists, and, with respect to any questions about "a delay in the ramp-up of [GAT] soybean," instructed them, "[U]nder no circumstances should you discuss our stacking strategy or specific yield

---

[46] *Id.* ¶ 145. The Complaint does not indicate whether the Annual Report was dated.

[47] *See id.* ¶¶ 8, 183.

[48] *Id.*. ¶¶ 153–54 & n.25. This "new approach" was announced as "bring[ing] together our best germplasm, Optimum GAT and AYT." *Id.* ¶ 154. The Plaintiff explains that AYT is not a trait like GAT or RR, but rather, a collection of marker technologies used to enhance crop yield. *Id.* at 58 n.25.

[49] *Id.* ¶ 155.

18

enhancement information with anyone who does not need to know."[50] He instead instructed them to focus on positive messages.

A General Manager of the Company, Martin Fabrizius, responded to the Q&A document the next day, questioning, "Why do we feel compelled to make such allusions?"[51] Fabrizius further opined that the Q&A "talks about [the new approach] in a very unfortunate, misleading and untruthful way. We who have to face sales and the customer will pay for this piece of trash if it gets circulated."[52]

At the Goldman Sachs conference, Fyrwald represented that GAT was on target for a "limited commercial release in 2009."[53] In its February 19, 2008 Form 10-K, released a week after the conference, the Company indicated "new products such as Optimum GAT traits . . . will provide significant growth."[54] At this time, the Company was using "Optimum GAT"—previously only used to refer to GAT—to refer to both GAT alone *and* the GAT/RR Stack, interchangeably.[55]

Despite the documents referred to above, and the Plaintiff's allegation that stand-alone GAT had been abandoned by early 2008, the Committee's Report makes clear that throughout the spring and summer of 2008, the Company continued trials of GAT as a stand-alone product, in addition to conducting trials of

---

[50] *Id.* ¶ 156.
[51] *Id.* ¶ 157. The Plaintiff contends that this question was referring to yield potential and commercialization of GAT, as well as timing of GAT's release. *Id.*
[52] *Id.* (alteration in original).
[53] *Id.* ¶ 158.
[54] *Id.* ¶ 159.
[55] *Id.* ¶ 154; *see also supra* note 35 and accompanying text.

19

the GAT/RR Stack. The Committee notes that Company decided not to disclose its development of a stacked product at that time, after consulting with the legal department and others and determining that (1) the information was not material and (2) disclosure might be confusing to the market, as the Company had not made a final decision and testing was ongoing.[56] This is contrary to the Plaintiff's blanket assertion that the Company ceased its pursuit of GAT as a stand-alone product in January 2008.[57] The Committee found that, in considering multiple documents, including "certain documents [that] suggest that a decision to pursue stacking (and abandon the Optimum GAT standalone product) had been definitely made at some earlier point, the investigation revealed" that the decision to abandon stand-alone GAT was not in fact made until the fall of 2008.[58]

## C. Negotiations with Monsanto

Around this same time, in early 2008, in conjunction with ongoing negotiations internally known as "Project Green,"[59] Pioneer informed Monsanto that it was pursuing development of the GAT/RR Stack and was interested in a

---

[56] Opening Br. in Supp. of Defs.' and Nominal Def.'s Mot. to Dismiss Pursuant to Rule 23.1 Ex. A (Report of the Evaluation Committee of the Board of Directors of E.I. Du Pont de Nemours and Company) at 75 (the "Report").

[57] *See supra* notes 44–46 and accompanying text; Am. Compl. ¶ 8.

[58] Report at 75 n.293.

[59] *See* Am. Compl. ¶ 162 (characterizing the nature of the Project Green negotiations as "attempting to negotiate with Monsanto the right to stack GAT with RR"); *but see* Report at 90–91 & n.339 (noting that, more broadly, Project Green involved negotiation of "a potential collaboration related to output traits in soybeans," which ultimately included a negotiation for GAT/RR stacking rights).

20

"mutual stacking rights exchange."[60] In an April 18, 2008 email, Borel reported to Schickler, Bedbrook, Seelinger, and Cosgrove that a call with Carl Casale, Executive Vice President of Strategy and Operations for Monanto, had not gone well; Borel relayed that Carl "is not willing at this stage to stack Optimum GAT in."[61] This email, the Plaintiff contends, "demonstrates that the Defendants knew in April 2008 that it was Monsanto's position both that they did not have the right to stack GAT [with] RR under the 2002 License Agreement, and that Monsanto would not agree to same."[62] As outlined above, the Company continued to publicly promote GAT throughout the spring of 2008, while, the Plaintiff alleges, continuing to mislead by failing to disclose its true nature as a stack of GAT with RR.[63] On July 17, 2008, for example, the Company issued a press release stating it had received United States regulatory approval of GAT in soybeans, was planning demonstration plots in 2009-2010, and would introduce soybeans with GAT in 2011, "continu[ing] to misrepresent to the public that GAT was still a viable product in its pipeline despite the fact that the Company had abandoned it as a

---

[60] Am. Compl. ¶ 163.

[61] *Id.* ¶ 168.

[62] *Id.* ¶ 169. I note that the Report provides that August 25, 2008 "was the first time management realized Monsanto may be an obstacle to pursuing the [GAT/RR Stack]." Report at 94.

[63] See, e.g., Am. Compl. ¶¶ 174–87.

21

stand-alone product," all while "continu[ing] to conceal its plan to stack GAT with RR."[64]

Negotiations continued, and, on August 11, 2008, the Company made a proposal to Monsanto requesting "a full suite of rights to [RR]" and "stacking and out-licensing rights."[65] Monsanto rejected that proposal, and in its August 25, 2008 counterproposal, Monsanto offered "a full suite of rights" for a $1.5 billion payment.[66] The Company's management rejected the offer without consulting the Board, despite that figure being beyond the limit within which management could act without Board approval under the Company's Delegation of Authority limits.[67]

Senior management ultimately proceeded toward commercialization of the GAT/RR Stack without informing the Board and in spite of advice of the Company's counsel to Holliday, Kullman, Borel, Connolly, and Sager throughout 2008 "that the likelihood of litigation with Monsanto was high."[68] Likelihood of litigation is a risk factor mandating Board involvement, the Plaintiff contends.[69]

The same day as Monsanto's $1.5 billion counterproposal, in late August 2008, Schickler emailed the "Strategy Team" and "Operating Committee" to

---

[64] *Id.* ¶ 183 (noting further that the press release did not reference the GAT/RR Stack and that Soper acknowledged in an internal email that the Company had "not yet communicated externally" about the GAT/RR Stack).

[65] *Id.* ¶ 171.

[66] *Id.* ¶ 172.

[67] *Id.* The Delegation of Authority process is discussed below.

[68] *Id.* ¶ 173.

[69] *Id.*

22

discuss branding of the GAT/RR Stack when it would ultimately be introduced to the public. Schickler recommended referring to the stack as "Optimum GAT Soybean" and noted that "GRS may be used internally for a period, but all public and commercial references will be as 'Optimum GAT Soybean.'"[70] Alejandro Munoz, Vice President and Regional Director for the Company's North American region, responded, "[W]e want to call both GAT only and GAT stacked with [RR] the same thing? If these are two different products should we call them differently?"[71] Upon receiving a forwarded copy of this message, Linbo responded, "The plan is that we will not sell any GAT only beans, only the stack . . . and that growers just need to know that they can apply glyphosate to the crop and not where the tolerance comes from."[72]

On October 31, 2008, Monsanto's Casale wrote to Schickler to "remind [the Company] of the limitations on Pioneer's rights" under the 2002 Licensing Agreement, which "does not permit Pioneer to stack [RR] with [its] glyphosate-tolerant Optimum GAT event."[73] He further explained, "Until such time as an agreement is reached, Pioneer should stop unauthorized efforts to commercialize [RR] stacked with Optimum GAT, as this activity is a clear breach of the existing

---

[70] *Id.* ¶ 189.
[71] *Id.*
[72] *Id.* (alteration in original).
[73] *Id.* ¶ 193.

23

agreement between our companies."[74] In a meeting on November 21, 2008, the Company's legal team, which included outside counsel, "began sketching out their litigation plan regarding Monsanto, including analyzing their reformation and patent fraud defenses."[75]

### D. *The Monsanto Litigation*

#### 1. Litigation, Verdict, and Concurrent Statements on GAT[76]

The Report explained that the parties began to engage in contractually mandated mediation in December 2008 for stacking issues, as well as other issues not relevant here.[77] In the months leading up to mediation, which took place in May of 2009, the Company began to disclose its plan to stack GAT with RR. In January, the Company "recorded a video presentation given by Soper meant to publicly disclose in February 2009 DuPont's plans to stack GAT with RR."[78] In the video, Soper explained that both traits were used because, as the Company conducted research trials, it "determined that the combination demonstrated improved crop tolerance and stronger yields;" the Plaintiff contends that the video failed to acknowledge that GAT as a stand-alone product had a number of problems that had been known to the Company for a year, and falsely represented

---

[74] *Id.*

[75] *Id.* ¶ 195 (quoting Report at 96).

[76] Maintaining the attempt to recount the facts in chronological order, this subsection of the Background Facts involves the ongoing process toward, and in, litigation, as well as contemporaneous statements made within or by the Company regarding development of GAT.

[77] Report at 96–97.

[78] Am. Compl. ¶ 197.

24

that the Company had the right to stack.[79] On January 23, in preparation for questions from interested parties, Willits emailed Soper a document for distribution to the Company's researchers; it provided, as a response to a question about when Pioneer assumed the rights to stack RR with GAT, that "[d]etails of the agreement are confidential."[80] Suggesting an "agreement" at all, the Plaintiff argues, misrepresented that the Company had a right to stack GAT with RR.[81] The video was first released internally on February 2, 2009, and a "limited amount of information regarding GRS was disclosed on February 10, 2009 at the Goldman Sachs Ag Conference, and the Company followed up with a 'media day' where Linbo presented more details."[82]

Mediation was held on May 4, 2009, the same date that Monsanto filed an action in the U.S. District Court for the Eastern District of Missouri (the "District Court") alleging breach of the 2002 License Agreement, patent infringement, inducement to infringe, and unjust enrichment based on stacking GAT with RR (the "Monsanto Litigation"). In a press release the next day, Borel stated that the "lawsuit incorrectly claims that Pioneer and DuPont may not combine ('stack') the innovative [GAT] trait with any soybeans already containing a Roundup Ready

---

[79] *Id.* ¶ 197.
[80] *Id.* ¶ 199.
[81] *Id.*
[82] *Id.* ¶ 198.

trait."[83] It further stated, "Monsanto's so-called 'stacking' restriction is one of many practices that Monsanto engages in to limit the availability of competitive products," referring to a "monopoly."[84] Kullman attached the news release in an email to the Board on May 15, 2009, which included Bodman, R. H. Brown, R. A. Brown, Collomb, Crawford, Cutler, Dillon, E. du Pont, Hewson, Holliday, Reilly, and Juliber, and informed them of the Monsanto Litigation.[85] According to the Report, "This was the first time the Board had been informed of the Optimum GAT stacking strategy and/or the dispute with Monsanto regarding same."[86]

Meanwhile, the Company continued to promote GAT; at a May 28 conference, Kullman presented a slide that listed the value of GAT in corn at over $400 million, and up to $100 million in soybeans.[87] In a June 12 conference call with analysts, Ross was asked about "numerous reports that [the Company's] Optimum GAT just doesn't work," as well as what the Company would do "if this GAT technology just doesn't work and [it] can't license Monsanto's technology?"[88] Ross reiterated that the Company would "be bringing Optimum GAT and soy to the marketplace" in 2011and that the "Optimum GAT soy stack

---

[83] *Id.* ¶ 204.
[84] *Id.*
[85] *Id.*
[86] *Id.* (quoting the Report at 97).
[87] *Id.* ¶ 205.
[88] *Id.* ¶ 206.

with Roundup is [] bringing the best products to the market."[89]  The Plaintiff points out that Ross was Vice President for the North American region, and alleges that, as such, he must have known at the time that GAT did not work as a stand-alone product and that the GAT/RR Stack breached Monsanto's licensing agreements.[90]

In its Answer in the Monsanto Litigation on June 16, 2009, and in a press release of the same day, the Company took the position that stacking was within the Company's rights under the 2002 License Agreement.  Borel was quoted as asserting, "We believe we have every right through our existing Monsanto license agreement to 'stack' our Optimum GAT trait with Pioneer soybean genetics already containing a Roundup Ready trait," and that the Company would "vigorously defend [its] rights to bring valuable new technologies to the market."[91]  By July, Kullman stated to the Board the Company's position that its Optimum GAT soybean launch was still planned for 2011, but added the caveat that this was "pending the outcome of Monsanto's litigation."[92]

Upon Monsanto's motion, a September 6, 2009 order partially stayed discovery and bifurcated the trial to separate the Company's antitrust counterclaims from Monsanto's patent claims.[93]

---

[89] *Id.* (alteration in original).
[90] *Id.*
[91] *Id.* ¶ 207.
[92] *Id.* ¶ 208.
[93] Report at 101.

27

Despite pending litigation, the Company's efforts to bring the GAT/RR Stack to market continued, as did, the Plaintiff alleges, a number of misrepresentations. These misrepresentations include a presentation attached to an internal email on September 11, 2009, which included a "GAT Technical Update" that characterized GAT as "[o]n target for 2011 launch" and detailed the regulatory efforts underway for GAT and the GAT/RR Stack; the GAT/RR Stack was to be submitted for regulatory approval in the fourth quarter of 2009, but the presentation noted that some countries would likely reject the application without a letter of authorization from Monsanto regarding the RR component.[94] Accordingly, its "[r]egulatory legal options/strategy" was "in coordination with Monsanto litigation."[95] Despite ongoing development and licensing problems, GAT was referred to as among "DuPont solutions" in a November 3, 2009 investor meeting in which Kullman described a $700 million investment by the Company in its research and development.[96] The Plaintiff also points to a press release issued on December 4, 2009 as misleading; the Company "represented that 'Optimum GAT soybeans have shown outstanding glyphosate and ALS herbicide tolerance efficacy and strong multi-year yield results,' despite the years of research to the

---

[94] Am. Compl. ¶¶ 210–11. The Complaint provides that the draft presentation was attached to an internal email chain between Schmidt, Bedbrook, Schickler, Cosgrove, Niebur, Borel, Soper, and others, and was drafted in part by Stephens. *Id.* It is not clear from the record to whom the presentation was made.
[95] *Id.* ¶ 211.
[96] *Id.* ¶ 212.

28

contrary,"[97] and also represented that a delay in GAT's commercial launch was "due to changes in regulatory policy in key import markets and increasing complexity in managing grain stewardship."[98] In particular, Schickler stated that the Company's "continued confidence in the Optimum GAT trait is supported by significant data," thus showing, the Plaintiff contends, that "the Company continued the deception it had started years prior by attempting to craft a plausible excuse for GAT's delay."[99]

The Plaintiff further alleges that the misrepresentations carried over into the Monsanto Litigation, where the Company argued that it was permitted to stack GAT with RR. The Plaintiff alleges that "[t]he Individual Defendants knew that the Company's position . . . was untrue, but remained silent and/or actively concealed that the Company knew that it did not have a license to stack."[100]

On January 15, 2010, the District Court granted a motion for partial judgment on the pleadings in favor of Monsanto, simultaneously dismissing a counterclaim for declaratory judgment, finding that the 2002 License Agreements were unambiguous and did not grant DuPont the right to stack with RR.[101] The Board was informed of the District Court's decision on January 16. The following week, Kullman updated the Board on the 2009 Business Plan, echoing language

---

[97] *Id.* ¶ 213.
[98] *Id.*
[99] *Id.*
[100] *Id.* ¶ 214.
[101] *Id.* ¶ 215.

29

made publicly in stating, "Optimum GAT soybeans are delivering excellent efficacy results and superior product performance gains. Regulatory delays now put introduction at 2013."[102] The Complaint alleges, however, that "the Officer/Employee Defendants, as well as the Director Defendants, knew that the reasons for the delay in commercializing the GAT/RR Stack were not 'regulatory delays,' but that the Company did not have licensing rights to the RR trait."[103]

On January 29, 2010, the Company filed a motion for reconsideration, arguing that the District Court should await factual development before certain of its rulings. That motion was granted on July 30, 2010.[104]

Upon being granted leave, the Company filed a seconded amended answer and counterclaims on August 19, 2010, adding details to its reformation claim.[105]

On March 4, 2011, Monsanto filed its fifth motion to compel the production of documents, arguing that, through its reformation claim, the Company had put its state of mind at issue and thus waived attorney-client privilege as to certain related documents. The District Court agreed and ordered the Company to produce the documents should they wish to pursue the reformation claim.[106]

---

[102] *Id.* ¶ 217.

[103] *Id.* The Complaint also asserts that the Defendants were aware, and Monsanto had publicly stated, that its RR patents would expire in 2014 and that it would allow generics in the marketplace. *Id.*

[104] *See* Report at 103–104; Am. Compl. at 86 n.29.

[105] Report at 105-106.

[106] The Report explains the Company's rationale in continuing to pursue its counterclaim even at the cost of producing privileged documents. *See id.* at 106–107.

## 2. Sanctions

On September 6, 2011, Monsanto filed a motion for sanctions—its fifth in the litigation—against the Company, alleging that the Company's arguments that it had bargained for and received stacking rights during negotiation with Monsanto were based on false statements. Monsanto argued that document production enabled by waiver of attorney-client privilege had shown that the Company did not ever truly believe that it had obtained stacking rights. That same day, the Company produced 24,416 documents, which the Plaintiff alleges, the District Court ordered the Company to produce three months prior.[107]

The District Court granted the motion for sanctions on December 21, 2011, finding that the Company had "committed a fraud on the Court" and identifying what it found to be seventeen false statements made in pleadings and other court documents, which statements were "clearly refuted by internal documents" the Company produced.[108] The Sanctions Order articulated five categories into which the false statements fell; the District Court's attitude toward the Company is demonstrated by the fact that, in addition to citing the four categories of false statements alleged by Monsanto, it added one of its own accord, not identified in Monsanto's brief. These included: (1) "Defendants' assertion that [they] could sell

---

[107] Am. Compl. ¶ 227.
[108] *Id.* ¶ 230; *see also* Report at 108. Although not relevant to the Motions to Dismiss pending before me, the Plaintiff notes that the Eastern District of Missouri previously sanctioned DuPont for misconduct in litigation with Monsanto, back in 2001. *See* Am. Compl. at 92 n.31.

31

RR/[GAT] stacked seeds;" (2) "Defendants' assertion that they always believed they could make RR/[GAT] Stacks under the license agreement;" (3) "Defendants' assertion that the definition of 'licensed field' in Section 2.09 of the license agreement has no relation to stacking;" (4) "Defendants' assertion that they had no idea that the 'licensed field' related to stacking until Monsanto told Defendants it did in 2008;" and (5) "Defendants' contention that section 3.01(a) does not contain any type of field of use limitation."[109] The District Court found that the Company's position that it had the right to stack GAT with RR "was never rooted in fact, but was a fabrication based on a false misrepresentation to the Court."[110] Finding the Company's behavior "so egregious that only the most severe sanctions will deter future misconduct,"[111] the District Court struck DuPont's reformation defense and counterclaims and granted Monsanto its attorneys' fees.

The Sanctions Order was subject to a protective order that precluded dissemination even within the parties. The Company, however, sought approval to share the Sanctions Order with its CEO, General Counsel, and head of its Audit Committee, a request the District Court ultimately granted.[112]

---

[109] *See* Report at 108–09 (quoting Memorandum and Order, *Monsanto Co. v. E. I. du Pont de Nemours & Co.*, No. 4:09-cv-00686-ERW (E.D. Mo. Dec. 21, 2011) at 5, 8, 15, 19, 20).
[110] Am. Compl. ¶ 230.
[111] *Id.* ¶ 232.
[112] Report at 108–09. The Report details the discussions with Mr. du Pont, head of the Audit Committee. *See id.* at 109–10. When the Sanctions Order was unsealed on November 16, 2012, Kullman sent the Board an update in which she reiterated that the Company had not defrauded the Court and expressed her view that there were multiple errors of law in the Order. *Id.* at 115.

In January of 2012, the Company's outside counsel advised it to "proactively take all steps asap to discontinue commercialization of GRS including withdrawing stack registrations," a recommendation which was then disseminated to management.[113]

In pre-trial motions decided on June 6, 2012, the District Court granted Monsanto's motion for summary judgment on its breach of contract claim, but granted the Company's motion for summary judgment on Monsanto's claim for $1.2 billion in contract damages, which figure was based on the value of a commercialization license. The District Court found instead that the damage would be limited to "a reasonable royalty that contemplates a research and development license."[114]

The parties attempted to engage in settlement discussions, but, as Kullman relayed to the Board, "[D]iscussions broke down . . . when Monsanto reneged on key principles of agreement previously endorsed by both parties," which had been reviewed with the Board in the prior week.[115]

Trial on Monsanto's patent claims began on July 9, 2012. On August 1, the jury deliberated for less than an hour before returning a verdict in Monsanto's

The Complaint alleges that the market value of DuPont's stock dropped nearly $400 million that same day. Am. Compl. ¶ 232.

[113] Am. Compl. ¶ 234. I note, however, that the Report states that the Company had decided to abandon plans to commercialize the GAT/RR Stack before this point, in November of 2011. *See* Report at 111.

[114] Report at 112.

[115] *Id.* at 113.

favor and awarding it *$1.2 billion* in damages, the same figure the District Court had rejected as contract damages. Sager met with the Board that day and the next to discuss the verdict and potential next steps. At a September 14 Board meeting, Sager reported to the Board that it was "probable" that the award would be overturned on appeal given the fact that the Company had not actually sold any stacked seeds, that the District Court judge had been overturned on IP cases in the past, and that very few verdicts of this size had been upheld on appeal.[116] The Board ultimately decided to proceed with the appeal.

In its Form 10-Q for the period ending September 30, 2012, the Company indicated that it believed "it will prevail on appeal" and that, the verdict notwithstanding, "no amounts have been accrued related to this matter."[117] The Plaintiff alleges that this "violat[ed] GAAP and def[ied] common sense,"[118] as did the Company's failure to record contingent liabilities in connection with the Monsanto Litigation in any of its 2009, 2010, 2011, or 2012 Forms 10-K.[119]

### 3. Settlement

---

[116] *See id.* at 114–115.

[117] Am. Compl. ¶ 237 (quoting Form 10-Q, Sept. 30, 2012, at 14).

[118] *Id.*

[119] *Id.* ¶ 233. *See also id.* ¶¶ 218, 219. As the Plaintiff notes, the Company represented over these years, for example, that it believed the Monsanto Litigation "unlikely to adversely affect the company's commercial results for soybean and corn seed," and indicated that the Monsanto Litigation had not altered the Company's "commercialization plans for products with the Optimum GAT trait." *Id.* ¶ 219.

34

At a January 21, 2013 Board meeting, Borel presented that Monsanto had reached out regarding a potential settlement with Pioneer and that the District Court had stayed post-trial motions until February 1, 2013 to allow settlement discussions. Borel noted that the Company's focus was a settlement with business value.[120] On February 5, Sager sent a memorandum to inform the Board that the parties had agreed to a term sheet, and advising that he would share further details as they were finalized.[121] Ultimately, the Board approved a settlement on March 5, and it was finalized by the parties on March 25, 2013 (the "Settlement"). The Company announced the Settlement on March 26, with its terms including a payment of $1.75 billion over ten years for the rights to use the patent for RR and, beginning in 2018, a non-exclusive, royalty-bearing license for use of RR2 in the United States and Canada (the "RR2 Agreement").[122] The Settlement resulted in a dismissal of the antitrust and patent claims, as well as the jury award, but did not address the Sanctions Order. The Plaintiff alleges that the Company, "[c]onsistent with its improper disclosures in its earlier SEC filings, in its 2013 Form 10-K," stated that the patent infringement claims were offset by the antitrust

---

[120] Report at 115.
[121] Id.
[122] Am. Compl. ¶ 238.

counterclaims, "once again representing that the [j]udgment did not harm the Company."[123]

On appeal, the Court of Appeals for the Federal Circuit affirmed the Sanctions Order, finding "bad faith and vexatious conduct," but holding that such conduct "did not satisfy the high standard for 'fraud on the court.'"[124]

### E. Board Investigation

In September 2012,[125] the Board authorized formation of a special committee (the "Committee") to "investigate Monsanto's recent allegations that DuPont's senior leadership and Board repeatedly failed to investigate Monsanto's claim that DuPont publicly praised the virtues of its GAT technology while concealing evidence that the GAT technology was failing."[126] The Committee was also tasked with reviewing "previous findings of DuPont's counsel in response to allegations Monsanto made in 2009 regarding DuPont's public statements about its GAT technology and the commercialization of GAT products."[127] The Board

---

[123] *Id.*

[124] *Id.* ¶ 241.

[125] The Complaint alleges the Board authorized the Committee on September 4. *See id.* ¶ 245. The Report provides that the Board adopted a resolution appointing the Committee on September 14. *See* Report at 6.

[126] Am. Compl. ¶ 245.

[127] *Id.* ¶ 246. The Plaintiff notes that no such "findings of counsel" or Board materials authorizing such earlier investigation have been provided. *See id.* at 100 n.35.

appointed directors Andreotti and Thomas to the Committee, both of whom had joined the Board after the Monsanto Litigation was filed.[128]

On December 21, 2012, the first stockholder demand was made (the "December 2012 Stockholder Demand"). On January 21, 2013, the Board adopted a resolution authorizing the Committee to investigate that demand, which authority was later extended to investigate a second stockholder demand dated April 2, 2013 (the "April 2013 Stockholder Demand," and, together with the December 2012 Stockholder Demand, the "Stockholder Demands"). The Plaintiff concedes that these demands contained substantially the same allegations made by the Plaintiff here in its subsequent demand.[129] The Committee retained counsel to assist in its investigation, and the Committee produced its findings in its detailed Report.[130] The Board retained the authority to act with respect to those demands.[131]

The Report concluded that it was not in the Company's best interest to pursue litigation and recommended that the Board reject the stockholders' demands in full. Because the Plaintiff alleges that "[t]he Committee's recommendation to reject Plaintiff's Demand outright[,] and the 'facts' and conclusions that underlie it, raise a reasonable doubt as to the reasonableness and good faith nature of the Committee's investigation and recommendation and the

---

[128] *See* Report at 2; Am. Compl. ¶¶ 33, 43.
[129] *See* Am. Compl. ¶ 244.
[130] As noted, the Report is cited in the Complaint and incorporated by reference therein.
[131] See Am. Compl. ¶ 249.

Board's vote thereon,"[132] I will briefly recount the Report and its findings. First, however, I think it is important to provide context of the Company's controls and processes, as they figure prominently both in the Report and in the Complaint.

*F. DuPont's Processes and Controls*[133]

### 1. The Board and its Committees

The Board is comprised of all independent directors, as defined by New York Stock Exchange rules and the Company's internal guidelines, with the exception of the Chairman, who is the CEO. The Lead Director, who serves as liaison between the Chairman and the rest of the Board and is tasked with reviewing and approving information sent to the entirety of the Board, is also independent. The Board has had ten to thirteen members for the period relevant here.

The Board operates pursuant to the Company's Code of Business Conduct and Ethics. It is responsible for "oversight of management and stewardship of the Company," evaluating strategic initiatives, approving strategy and major corporate actions where appropriate, "ensur[ing] processes are in place to maintain the Company's integrity, monitor[ing] the performance of and compensat[ing] the

---

[132] *Id.* ¶ 257.

[133] The information that follows is taken from the Report. The Complaint incorporates the Report by reference, and refers extensively to the Company's controls and internal procedures, and so I think it helpful to recount what those controls and procedures are, as articulated by the Committee, at least in part. The Report is more detailed than I endeavor to be here for present purposes.

38

CEO, and supervis[ing] succession planning for the CEO and other key positions."[134]

The Board has five standing committees, all of which were in place in 2006: the Audit Committee, the Environmental Policy Committee, the Compensation Committee, the Corporate Governance Committee, and the Science and Technology Committee. The Report discusses the Audit Committee and Science and Technology Committee as relevant here.

The Audit Committee is responsible for, among other things,

> (1) reviewing with management and the independent auditors the Company's financial statements and disclosures under Management's Discussion and Analysis of Financial Condition and Results of Operations which are included in the Company's annual and quarterly reports; (2) meeting with management periodically to discuss guidelines and policies governing the processes used to assess, monitor, and control the Company's major risk exposures; and (3) establishing procedures for the receipt, retention and resolution of complaints regarding accounting, internal controls, or auditing matters, including procedures for the confidential, anonymous submission of complaints by employees of the Company.[135]

The Science and Technology Committee "monitor[s] the state of science and technology capabilities within the Company, oversee[s] the development of key technologies essential to the long term success of the Company, and review[s] the

---

[134] Report at 17.
[135] *Id.* at 18.

evolution of science and technology external to the Company for potential application within the Company."[136]

### 2. Office of the Chief Executive

The Office of the Chief Executive ("OCE") "has responsibility for the overall direction and operations of the Company's various businesses."[137] The OCE "regularly receives reports from each business line (*e.g.* Pioneer) to review strategy and execution, and advise with respect to key decisions and transactions."[138] It regularly reports to the Board and its committees.

### 3. Delegation of Authority

The Delegation of Authority ("DOA") process "sets monetary limits for the approval required for a particular decision," and governs decisions regarding, among other things, litigation.[139] As relevant here, corporate authority limits for litigation decisions are as follow: the CEO may approve up to $20 million, the OCE may approve up to $100 million, and anything higher must be approved by the Board.[140]

---

[136] *Id.* at 19.
[137] *Id.*
[138] *Id.* at 20.
[139] *Id.*
[140] *See id.* (noting the corporate authority limits for "Authority to Sign Definitive Agreements" and further stating that the limits for making decisions related to "Litigation and Claims" follow the same scale).

4. Ethics and Compliance Central and the Corporate Compliance Committee

Ethics and Compliance Central ("E&CC") is led by the General Auditor and Chief Ethics and Compliance Officer ("CCO"), with a mission to "[h]elp set the stage, be a catalyst, provide tools and enable Businesses, Functions, and Regions to track, monitor, and manage ethics and compliance processes on their own."[141] Compliance Officers are assigned various responsibilities and report to the CCO. They also work with "Process Owners," employees who are assigned to sixteen risk areas and are "responsible for driving compliance in his/her respective area throughout the Company."[142]

E&CC handles "maintenance and continual review of DuPont's Code of Conduct and training programs."[143]

5. Internal Audit

Internal Audit provides "monitoring and independent assurance with regard to internal controls and ethics compliance."[144] Led by the CCO, it "evaluates the Company's existing internal controls, helps identify risk areas, and supports

---

[141] *Id.* at 20–21.
[142] *Id.* at 22.
[143] *Id.* at 23.
[144] *Id.* at 26.

business lines in developing ways to mitigate those risks."[145]  The CCO reports to the CFO as well as to the Audit Committee.

### 6. Additional Risk Oversight

In 2010, at the Audit Committee's direction, a Board-level "Risk Oversight Process" was implemented. Its purpose was to "[e]stablish, maintain and regularly review the oversight process for key risks managed by the OCE and monitored by the Board to protect the Company from adverse impacts to its financial results, operations and reputation."[146]  This process is distinct from the E&CC processes described above, and involves different, though somewhat overlapping, risk areas to which Process Owners are assigned.[147]  Process Owners work with assigned members of the OCE to comment on proposed presentations by that Process Owner to the Board.  The Board, with the OCE, also conducts a "risk refresh" annually in which it evaluates the Risk Oversight Process for the year and determines whether to add new risk areas.

### 7. Litigation Management

As provided in the Report:

Each litigation matter is managed by an in-house counsel lead, who retains and coordinates with outside counsel as appropriate. The in-house counsel reports to, and coordinates strategy with, an Assistant General Counsel or the General Counsel. The Board and Audit

---

[145] *Id.*
[146] *Id.* at 29.
[147] *Id.* at 29 & n.91.

Committee are updated by the General Counsel on the status of the litigation in three ways: (1) an Annual Litigation Report; (2) regular reports at Board and Audit Committee meetings; and (3) periodic oral or written updates on noteworthy developments. The Board and Audit Committee actively engage on these updates and ensure the Company is adequately assessing risk associated with legal matters.[148]

### 8. Controls Regarding Disclosure

As outlined in greater detail in the Report, the Company has a set process it uses in preparing for filing of the Company's periodic disclosures with the SEC. It also has a disclosure committee, as recommended by the SEC, which considers, among other things, materiality of certain information.

Non-periodic disclosures made to customers, business partners, and investors involve a different process. Disclosures to investors involve the legal department, as well as the investor relations group and corporate communications group, together with members of applicable business units. If the Company is disclosing highly technical or scientific information for the first time, members of the applicable research team may be involved. If the Company is disclosing financial figures, those numbers are reviewed by the relevant groups as well.

Non-investor disclosures may involve marketing, legal, finance, and investor relations departments as necessary. "Once the proposed disclosure is reviewed and approved by these content experts, it is reviewed and approved by senior

---

[148] *Id.* at 30.

43

leadership."[149]   The Committee notes that corporate approval is not necessarily required if the disclosure is non-substantive, for example, disclosure about opening a new research facility.[150]

### 9. Stages & Gateways

The Report notes that the Company has "various oversight policies to help guide its investments," given the "inherent[] uncertain[ty]" involved in the Company's research and development investments.[151]   As one example, it points to "Stages & Gateways," a formalized process used by Pioneer to provide "a rigorous development roadmap to maximize the probabilities of technical, regulatory and commercial success" and "transparency into the objectives and status of [DuPont's] biotech research pipeline."[152]   The process involves seven phases ("Stages"), as well as decision points between Stages ("Gateways").

### 10. Freedom to Operate

"Freedom to Operate" is an "assessment of the ability to develop, make, and market products without legal liabilities to third parties."[153]   It involves a review generally conducted when the Company "(1) introduces a new, reformulated or redesigned product or process; (2) learns about the patenting of a competitive

---

[149] *Id.* at 34.
[150] *Id.* at 34 & n.113.
[151] *Id.* at 35.
[152] *Id.* at 35 (alteration in original).
[153] *Id.* at 38.

44

product; (3) purchases a business or technology; or (4) receives a letter discussing possible infringement."[154]

### 11. Improvements to the Company's Oversight Policies

The Report details the Company's regular evaluation of its policies and procedures and provides examples of changes it has made "relevant to the issues addressed herein," including enhancements to Stages & Gateways, modification of disclosure practices relating to disclosure timelines for commercialization of new products, and creation of new oversight committees and groups tasked with analyzing contract rights and/or patent infringement issues, including a group specifically tasked with interpreting contracts with Monsanto.[155]

*G. The Committee Report*

The Report is 179 pages and the product of a nearly year-long investigation by the Committee with assistance of counsel. In conducting its investigation,

> [t]he Committee and its counsel collected and reviewed thousands of documents from numerous sources both inside and outside the Company, reviewed over 25 days of sworn deposition testimony and the entire Monsanto Litigation trial transcript, conducted interviews of 23 witnesses (some more than once), conducted additional factual research using publicly available documents (such as court and regulatory filings, analysts reports, and other media coverage), and conducted extensive legal research into the claims asserted, relevant presumptions and burdens affecting the viability of those claims, potential defenses to the claims, and other considerations.[156]

---

[154] *Id.* at 39.
[155] *Id.* at 39–40.
[156] *Id.* at 2–3.

45

The Committee ultimately concluded that "pursuing the [derivative] claims . . . is not in the best interests of the Company and its shareholders because (1) none of the claims has factual or legal merit; and (2) even if they did, the costs and risks of pursuing litigation far outweigh any potential benefit."[157] In reaching that conclusion, however, the Report undertakes an examination of several categories of facts giving rise to potential causes of action, based on the December 2012 Stockholder Demand and the April 2013 Stockholder Demand: the development of Optimum GAT as a stand-alone product, the decision to pursue testing and commercialization of the stack, the management of the Monsanto Litigation, the Company's entrance into the RR2 Agreement that was part of the Monsanto settlement, the Company's disclosures relating to Optimum GAT, oversight claims, unjust enrichment, and legal malpractice by Company counsel in the Monsanto Litigation. The Committee also considered "other factors," which included indemnification and advancement, statutes of limitations, and the time, expense, and business impact of litigation.[158] Each of these areas of the investigation is discussed in turn.[159]

---

[157] *Id.* at 3.
[158] *Id.* at 171–73.
[159] The Report recounts, in far greater detail than I endeavor to undertake here, the factual findings from the investigation.

## 1. The Committee's Analysis of the Development of GAT

In considering allegations that certain of the Defendants breached fiduciary duties in connection with the continued development of GAT as a stand-alone product, "the Committee's investigation uncovered no evidence that any of the Company's directors, officers, or employees were grossly negligent, acted in bad faith or otherwise breached their fiduciary duties."[160] On the contrary, the Committee concluded:

> [M]anagement relied upon and executed on formalized business level processes (including Stages & Gateways) to ensure oversight of product development and input of appropriate personnel, including business leaders, scientists and Legal. The Committee finds that the Company's management was apprised of significant developments and research results relating to Optimum GAT, including interim testing issues. The Committee further finds that management made informed and well-reasoned decisions to continue developing and testing Optimum GAT despite interim testing concerns.[161]

Specifically, the Committee noted that certain adverse testing results in 2006 to mid-2007 were relayed to management but "were viewed as outliers, and no one questioned the long term viability of the product—particularly in light of the promising results of previous testing."[162] Rather, "[t]he Committee believe[d] that management's decisions related to Optimum GAT were reasonable and must be analyzed in the overall context of the product development process," which it

---

[160] *Id.* at 132.
[161] *Id.* at 133.
[162] *Id.*

47

characterized as, "by its very nature, inherently uncertain."[163] The Committee concluded that, "at each juncture, management engaged in a thorough analysis of whether to continue developing Optimum GAT as a standalone product and, given the potential benefits of the product, made reasonable decisions, acting in good faith, based on this analysis."[164]

## 2. The Committee's Analysis of Stacking

In considering an allegation that certain directors, officers, and employees should be held liable for breaches of fiduciary duties "by exposing the Company to civil liability for patent infringement and breach of contract with Monsanto," in pursuing the GAT/RR Stack, the Committee "uncovered no evidence that any of the Company's directors, officers, or employees were grossly negligent, acted in bad faith or otherwise breached their fiduciary duties."[165] Rather, "Company's management relied upon and executed on formalized business level processes requiring legal input before making decisions regarding the stacked product." Specifically, the Committee found that "counsel was involved at three key stages of the stack's development": (1) prior to creating test crosses, in July 2007; (2) when management decided to pursue development of the stack as a commercial

---

[163] *Id.* at 134.

[164] *Id.* at 135. The Report also considered a waste claim based on a stockholder allegation that expending resources on GAT as a stand-alone product after discovering it was not viable was a waste of corporate assets. The Committee found management to have acted in good faith, with valid business reasons for continuing to develop GAT. *See id.* at 135–36.

[165] *Id.* at 136.

product, in January 2008; and (3) when Monsanto "first objected in August 2008, asserting that the Company did not actually have the right to stack."[166] Specifically addressing some of the facts underlying the District Court's Sanctions Order, the Committee concluded:

> [T]he Company's legal analysis regarding its stacking rights was thoughtful and thorough, based both on the plain language of the [2002 License Agreement] and the negotiation history. Although the [District] Court ultimately disagreed, the Committee finds that the legal team had a good faith basis for its conclusion that the Company could proceed with the stacking strategy.[167]

As to a claim that the directors, officers, and employees wasted Company assets in connection with the Monsanto litigation, the Committee found, "[I]t cannot be said that the directors, officers or employees 'irrationally squandered' corporate assets in connection with the stacking strategy," having previously concluded they acted in good faith and on the good faith advice of counsel.[168]

### 3. The Committee's Analysis of the Management of the Monsanto Litigation

The December 2012 Stockholder Demand, which was one of the subjects of the Committee's investigation, alleged that mismanagement of the Monsanto Litigation resulted in "a billion dollar judgment against the Company, a severe sanctions Order against the Company by a federal judge, [and] untold legal

---

[166] *Id.* at 136–38.
[167] *Id.* at 139.
[168] *Id.* at 144.

49

fees . . . ."[169] Likewise, the Plaintiff in the instant case alleged, in its cause of action

for waste:

> Due to the wrongful acts of the Individual Defendants, the Judgment was entered against the Company in the amount of $1 billion, the Company was sanctioned by a Federal Judge and millions of dollars were spent on attorneys' fees and other expenses in connection with the Sanctions Order, the Monsanto Litigation and otherwise.[170]

In responding to the December 2012 Stockholder Demand allegations, the

Committee's investigation "uncovered no evidence that any of the Company's

directors, officers, or employees were grossly negligent, acted in bad faith or

otherwise breached their fiduciary duties with respect to the management of the

Monsanto Litigation."[171] Rather, the Committee found that "management made

fully informed decisions, in good faith, that they reasonably believed to be in the

best interests of the Company."[172] Specifically, the litigation was "well-managed,

with thoughtful, reasonable strategic decisions made throughout the Litigation."[173]

That the District Court disagreed with the arguments presented did not lead the

Committee to conclude that the various setbacks in litigation were the result of

gross negligence, bad faith, or other breaches of fiduciary duty: "Indeed, the

Monsanto Litigation was part of a global strategy designed to push back against

---

[169] *Id.* at 144.

[170] Am. Compl. ¶ 358. It is not clear if the Plaintiff is specifically alleging mismanagement of the Monsanto Litigation, as was raised in the December 2012 Stockholder Demand.

[171] Report at 144.

[172] *Id.*

[173] *Id.* at 145.

Monsanto's attempts to use its trait monopoly to suppress competition through Project Choice, and the Company had been successful with these efforts in the past in getting Monsanto to change its practices."[174]

The Committee further noted that the Company went into trial with "the reasonable belief that its exposure to a large damages award would be limited because the Company had never sold—and would never sell—the stacked product, and [the District Court] had held that the damages calculation used by Monsanto's expert was 'speculative.'"[175] Ultimately,

> [a]fter careful analysis, the Committee [found] no basis to conclude that the Sanctions Order was the result of gross negligence, bad faith or other breaches of fiduciary duty on the part of any Company directors, officers, or employees. To the contrary, the Committee believes the Order was not well reasoned and reflects a fundamental misunderstanding by the Court of the key issues and statements made by the Company during the Monsanto Litigation.[176]

The Committee summarized "the most fundamental problem with the Sanctions Order" by noting:

> [T]he statements used by the Court to support the fraud finding simply do not say what the Court indicated they say; rather, the Committee concludes the alleged misrepresentations were true statements taken out of context or non-frivolous legal arguments that should not have formed the basis for a sanctions order.[177]

---

[174] *Id.*
[175] *Id.* at 145–46.
[176] *Id.* at 146.
[177] *Id.* at 147.

51

The Report details each misrepresentation the District Court found and provides a summary of its findings as to why none should have been the basis for sanctions.[178] It concluded, in the face of "copious evidence support[ing] [the Company's] good faith belief," that the Sanctions Order "appears to have been an error in judgment by the Court."[179] Further, the Committee found the litigation to be "well managed, with well-informed, reasonable strategic decisions made in good faith, and neither the Company nor any of its agents made any misrepresentations to the Court."[180] Thus, the Committee found "no basis for asserting that any of the Company's directors, officers or employees breached their fiduciary duties in connection with the Monsanto Litigation."[181]

Similarly, the Committee did not find a "viable claim for corporate waste based on the Company's decisions relating to the Monsanto Litigation."[182] Having concluded the strategy was reasonable and in good faith, the Committee was unable to conclude that "directors, officers or employees 'irrationally squandered' corporate assets in connection with the Monsanto Litigation."[183]

---

[178] The Report also provides internal cross-references to more detailed factual findings. *See id.* at 147–51.

[179] *Id.* at 151.

[180] *Id.* at 152.

[181] *Id.*

[182] *Id.*

[183] *Id.*

The appeal of the Sanctions Order was still pending at the time of the Report. On May 9, 2014, the Sanctions Order was affirmed in part.[184] The Federal Circuit found that the Company engaged in "bad faith and vexatious conduct" and "had abused the judicial process and acted in bad faith by making affirmative factual misrepresentations" to the District Court, but that its conduct "did not satisfy the high standard for 'fraud on the court.'"[185]

### 4. The Committee's Analysis of the Settlement

As part of its cause of action alleging waste, the Plaintiff alleged that "the Company settled with Monsanto for hundreds of millions more than it would have had to pay for license rights prior to the Monsanto Litigation."[186] The April 2013 Stockholder Demand raised similar issues, asserting claims for breaches of fiduciary duty in addition to waste, which claims were considered in the Committee's Report.[187]

The Report summarized, with references to its earlier more detailed findings, the process in which the Company engaged prior to executing the RR2 Agreement as part of its settlement with Monsanto, including an analysis of both the substance of the agreement and its value.[188] Further, to the contention that the Company should not have paid $1.75 billion for the rights to RR2 because it had previously

---

[184] Am. Compl. ¶ 282.
[185] Id. ¶ 241.
[186] Id. ¶ 358.
[187] Report at 152–53.
[188] Id. at 153–54.

been offered a $1.5 billion settlement, the Committee noted that the earlier offer "was related to [RR], not RR2, and provided far fewer rights than the RR2 Agreement. Thus, the Committee does not believe the two can be directly compared on a strict economic basis."[189] The Committee further found "no basis" to the "assertions that the $1.2 billion verdict was somehow incorporated into the new RR2 Agreement. The Company would have entered into the agreement irrespective of the settlement of the litigation because . . . the RR2 Agreement provided real value to the business, as confirmed by an independent third party appraiser."[190] Additionally, the Committee noted that the Company did not even "need to record a gain or loss for the settlement given that there was no delta between the value of the agreement and the agreement's payment obligations."[191] Thus, the Committee concluded there was no basis for asserting a breach of fiduciary duty on the part of any director, officer, or employee in connection with the Settlement. Further, there was no valid claim for waste: "it cannot be said that the directors, officers or employees 'irrationally squandered' corporate assets by entering into the RR2 Agreement."[192]

I note here that the Plaintiff criticizes the Committee's finding that the jury award had no impact on the Settlement on a number of grounds. The Plaintiff

---

[189] *Id.* at 154.
[190] *Id.*
[191] *Id.* at 154–55.
[192] *Id.* at 155.

alleges that the appraiser hired by the Company to value the intellectual property received in the Settlement "had a longstanding relationship with DuPont, creating an apparent conflict."[193] Further, the appraiser did not assign a value to the Settlement; instead, management did so "using a residual approach, receiving no advice from [the appraiser] or any other expert on whether such an approach was reasonable in the circumstances."[194] The Plaintiff also alleges that the appraiser did not "value the primary intellectual property obtained by DuPont in the settlement, instead backing into the number using a residual 'plug,' while it appropriately calculated values for other, less significant intellectual property rights."[195] Finally, the Plaintiff asserts that "no facts appear establishing that the offset of the billion dollar judgment against anti-trust claims that DuPont may have had, but never brought, is reasonable."[196]

### 5. The Committee's Analysis of Disclosures Concerning GAT

The Committee investigated allegations that

the Company made false and misleading public statements: (1) from 2006 to mid-2007 regarding the efficacy, yield advantage, commercialization timeline, and economic opportunities presented by Optimum GAT; (2) from mid-2007 to 2008 regarding the progress and commercialization timeline for Optimum GAT; and (3) in early 2008 regarding the "new approach" to Optimum GAT and the

---

[193] Am. Compl. at 96 n. 32.
[194] *Id.*
[195] *Id.*
[196] *Id.*

ultimate disclosure that Optimum GAT would be stacked with Roundup Ready.[197]

As to the first category of statements, made between 2006 and mid-2007, the Committee found that the "optimistic" statements, examples of which are listed in the Report,[198] were "not false or misleading, but were supported by extensive research results and reflected management's genuine enthusiasm for the product."[199] Though some testing results were negative, the Committee found that "the evidence demonstrates that these results were only found under stress conditions and were viewed as outliers—particularly in light of the promising results of previous testing—that did not jeopardize the future of Optimum GAT."[200] Ultimately, the Committee concluded that these statements could not be the basis of a breach of fiduciary duty claim as they were not false or misleading, but were made at a time when "management still believed Optimum GAT to be a great product that performed well, even in heavy dose situations, under normal conditions, and was 'on track' for commercialization in 2009."[201]

The statements made from mid-2007 to 2008 include statements alleged to be false or misleading because they continued to tout GAT's progress toward

---

[197] Report at 155–56. The Complaint does not allege that claims have been made against the *Company* for disclosure violations, or otherwise describe how the Company would show damages, assuming it brought claims relating to these disclosures, other than a vague allegation of general reputational injury, which the Plaintiff quantifies as "not less than $1 billion." *See* Am. Compl. ¶¶ 343, 350, 356.

[198] *See* Report at 157.

[199] *Id.* at 157–58.

[200] *Id.* at 158.

[201] *Id.*

commercialization, despite negative test results. The Committee noted that in summer 2007 the test results became more negative, and thus, were reported to senior management. The Committee found that, in the fall of 2007, the Company determined that the timeline for commercialization would likely be affected, but that "the evidence further demonstrates that the Company continued to believe, despite testing concerns, that commercialization was still 'on track' for 2009; the Company merely concluded that the release would be 'limited' in 2009."[202] The Committee pointed to a December 3, 2007 earnings call, in which Bedbrook noted that the release in 2009 would be "introductory," which was echoed in the accompanying investor presentation, to be distinguished from the "aggressive" launch planned for a release of Optimum GAT in corn.[203] The Committee concluded, in sum, that the statements in this second category time period were not false or misleading and thus could not be the basis of a breach of fiduciary duty claim.[204]

Finally, the Committee considered the statements made in 2008, with one subset referring to the "new approach" in GAT and the second subset referring to use of the umbrella term "Optimum GAT" for both the stand-alone trait and the stacked product.

---

[202] *Id.* at 159.
[203] *Id.* at 159–60.
[204] *Id.* at 160.

As does the Plaintiff in this case, the December 2012 Stockholder Demand asserted that, "[b]y January 2008, the Company finally concluded internally that it had to abandon GAT as a standalone-product, but decided on a new strategy of 'stacking' GAT with Roundup Ready,"[205] a decision not publicly revealed. In that context, the Committee investigated seven alleged misrepresentations, all of which are also alleged in the Plaintiff's Complaint.[206] The Committee concluded that "these and other statements relating to Optimum GAT during this period were not false or misleading."[207] Its conclusion was premised upon a finding that, contrary to the Plaintiff's allegations and despite evidence that "some individuals on the research team may have recommended transitioning away from the development of Optimum GAT as a standalone trait," taken as a whole "the evidence demonstrates that management decided testing should continue in order to determine the seriousness of the issues being encountered and whether the issues could be

---

[205] *Id. See also, e.g.,* Am. Compl. ¶ 308 ("By January 2008, while DuPont continued to publicly trumpet GAT's revenue-generating potential, falsely blaming delays in the commercial launch on Monsanto and the government, it had privately concluded that it had to abandon GAT as a stand-alone product. The Company decided on a new strategy of stacking GAT with RR to conceal the fact that GAT simply did not work."); *id.* ¶¶ 8, 134.

[206] I note this similarity only to emphasize that the Committee has specifically investigated the statements alleged by the Plaintiff in the instant case. *Compare* Report at 160, first bullet point, *and* Am. Compl. ¶¶ 154, 158; *compare* Report at 161, second bullet point, *and* Am. Compl. ¶ 159; *compare* Report at 161, third bullet point, *and* Am. Compl. ¶ 160; *compare* Report at 161, fourth bullet point, *and* Am. Compl. ¶ 174; *compare* Report at 161, fifth bullet point, *and* Am. Compl. ¶ 176; *compare* Report at 161, sixth bullet point, *and* Am. Compl. ¶ 183; *compare* Report at 161, seventh bullet point, *and* Am. Compl. ¶ 187.

[207] Report at 161.

resolved through further tests and breeding."[208] "Thus, in early 2008, Pioneer determined to proceed with the dual path of starting trials of the [GAT/RR Stack], while continuing trials of Optimum GAT as a standalone product."[209] The Committee concluded that it was consistent with this "dual path approach" for the Company to disclose that it was pursuing a "new approach" at the February 12, 2008 Goldman Sachs conference, as this "new approach" "could have included either the [GAT/RR Stack] or Optimum GAT standalone if breeding has resolved the issues being encountered under stress conditions."[210] The Committee found that while the Company had considered disclosing its strategy of pursuing a stacked product throughout 2008, its decision to wait to do so until 2009, "shortly after management had decided to pursue the stack as its sole Optimum GAT strategy" (I note, again, that this is a timeline with which the Plaintiff disagrees),[211] "was reasonable and did not render any public statements misleading."[212] The Committee concluded that "it would not have made business sense" to disclose the stacking strategy prior to the decision to pursue that strategy alone, as it could have been misleading to make such a disclosure and then decide not to pursue that

---

[208] *Id.* at 161–62.
[209] *Id.* at 162.
[210] *Id.*
[211] *See, e.g., supra* note 46 and accompanying text.
[212] Report at 162.

strategy; finally, the Committee noted that the decision was made in consultation with legal advisors.[213]

Finally, the Committee turned to the second subset of alleged misrepresentations made in 2008, those concerning the umbrella term "Optimum GAT" to refer both to the stand-alone and stacked product. The 2012 Stockholder Demand alleged, as does the Plaintiff here, that the decision to refer to the stacked product as "Optimum GAT" was misleading because, in referring optimistically to "Optimum GAT" trials, the Company concealed the truth with respect to the negative results in the stand-alone product trials.

The Committee found "that it was reasonable for the Company to refer to the stacked product under the umbrella term Optimum GAT," and that there were valid business reasons for doing so: "The Company had already spent significant time and money educating growers regarding the benefits of its Optimum GAT product line, . . . [and] [a]s those benefits remained the same, there was good reason to continue to tout them to the market as Optimum GAT."[214] Additionally, the Committee pointed out that "analysts were ambivalent to the news" when the Company expressly disclosed its GAT/RR Stack, because "there was no real financial impact to the stacking strategy in soy."[215] Because of the lack of a

---

[213] *Id.*
[214] *Id.* at 163.
[215] *Id.* at 164.

60

material financial impact, the Committee found that the Company's "generally optimistic statements" were not rendered misleading by virtue of the lack of clarity as to the nature of the product to which the statements referred.[216]

### 6. The Committee's Analysis of the *Caremark* Claim

The Committee considered allegations that the Board failed in its duty of loyalty by failing to oversee operations and risk, either by utterly failing to institute and maintain adequate internal controls, or by consciously failing to monitor or oversee existing controls. This *Caremark* claim was acknowledged by the Committee to be "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment."[217] Noting further that a plaintiff must show that the directors knew they were not discharging their fiduciary obligations, the Committee found no basis for an oversight claim.

In considering the first prong of *Caremark*, which requires a board to implement "information and reporting systems that are reasonably designed to provide to senior management and to the Board itself, timely, accurate information to allow each, within its scope, to reach informed judgments,"[218] the Committee outlined the "five standing committees tasked with overseeing the Company's operations and evaluating various elements of risk," as well as the "various

---

[216] *Id.* at 163–64.
[217] *Id.* at 164–65 (quoting *Stone v. Ritter*, 911 A.2d 362, 372 (Del. 2006)).
[218] *Id.* at 165 (quoting *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 969–70 (Del. Ch. 1996)).

structural and reporting mechanisms in place to ensure that issues are raised to senior management and then ultimately to the Board or its Committees."[219] The Committee also noted that the Company maintains processes to oversee the various reporting and oversight programs, including active oversight by the Board.[220] In considering these factors, as well as other specific policies and procedures outlined in the Report but not reproduced here, the Committee concluded that, "given the breadth of internal controls maintained at the Company and overseen by the Board," there was "no basis to suggest that the directors 'utter[ly] fail[ed] to attempt to assure a reasonable information and reporting system exists,' as would be required to 'establish the lack of good faith that is a necessary condition to liability' pursuant to the first prong of a *Caremark* claim."[221]

Turning, then, to the second prong of a *Caremark* claim, which would require a showing that the Board "consciously failed to monitor or oversee" the Company's operations,[222] the Committee considered that there were no red flags which would make the Board aware that the "internal controls were inadequate, that these inadequacies would result in illegal activity, and that the board chose to do nothing about problems it allegedly knew existed."[223] In reaching this conclusion, the Committee found that the "Board reasonably relied on proper

[219] *Id.*
[220] *Id.* at 166.
[221] *Id.* at 167 (quoting *Stone*, 911 A.2d at 369).
[222] *Id.* (quoting *Stone*, 911 A.2d at 370).
[223] *Id.* (quoting *Stone*, 911 A.2d at 370).

business processes . . . that were in place to ensure oversight" of the development of GAT, the GAT/RR Stack, and the Monsanto Litigation, and that "[n]o red flags were ever raised to the Board to make it question the adequacy of these processes."[224] Accordingly, the Committee was unable to find conscious disregard of oversight duties with respect to the development of GAT, stacking, or the Monsanto Litigation, including the Sanctions Order.

### 7. The Committee's Analysis of "Other Factors"

Finally,[225] the Committee turned to a handful of "other factors" bearing on its decision regarding litigation: (1) advancement and indemnification, (2) laches and statutes of limitations issues, and (3) the time, expense, and business impact of litigation.

The Report concluded, based on 8 *Del. C.* § 145 and the Company's bylaws, that the Company would be required to advance the legal fees of the individual Defendants in this action. Advanced legal fees would not be recoverable by the Company if the directors were successful, *i.e.*, the Company's claims were unsuccessful. Thus, having already determined that the directors and officers acted in good faith, did not commit breaches of fiduciary duties, or waste corporate

---

[224] *Id.* at 167–68.

[225] The Committee also considered claims for unjust enrichment and legal malpractice. Because these were not asserted in the Plaintiff's Complaint, I need not recite the Committee's findings here.

assets, the Committee concluded that the Company would likely not recover the costs of advancement.[226]

Next, the Committee considered the analogous three-year statute of limitations under 10 *Del. C.* § 8106 which could form the bases of a laches defense to the claims of breach of fiduciary duty and waste.[227] It considered three tolling doctrines, determined they were not applicable, and concluded that, in addition to lacking merit, these claims may be time-barred. It further noted that a federal securities law claim for misrepresentations would likely be barred as well.[228]

Finally, the Committee found that the costs by way of "significant distraction and impairment of morale for directors, officers, and employees of the Company" further weighed against bringing any claims.[229]

*H. The Plaintiff's Demand*

On January 17, 2014, the Plaintiff, in a letter to the Board, demanded inspection of the Company's books and records pursuant to 8 *Del. C.* § 220, and demanded that the Company investigate the misconduct associated with the Monsanto Litigation, breaches of fiduciary duties, and waste of corporate assets. The Plaintiff demanded such action be taken within 20 days and further requested

---

[226] *Id.* at 171–72.
[227] *Id.* The Committee also noted that there would be a laches defense for an unjust enrichment claim, as well as a three-year statute of limitations for legal malpractice, but such claims are not asserted in the present litigation.
[228] *Id.* at 173 & n.592. *See supra* note 197.
[229] Report at 173.

64

that the Company provide all materials previously provided to other stockholders.[230]

The Company provided the Plaintiff with the same information produced in response to other stockholder demands.[231] On January 28, 2014, the Board formally rejected "the substantially-similar litigation demands made by two other stockholders" from December 2012 and April 2013.[232] On January 30, the Company's outside counsel sent a letter acknowledging that the Plaintiff's demand was, in its "overwhelming majority," "identical" to the other stockholder demands made previously and indicating that it was sent to the Board for "further action."[233] Although the Board did not explicitly reject the Plaintiff's demand, the Defendants concede that it can be deemed to have done so, given the passage of time without an explicit response to the demand.[234]

*I. Procedural History*

The Plaintiff filed its Complaint on May 29, 2014. The Defendants filed a Motion to Dismiss on August 1, 2014, after which the Plaintiff filed an Amended Complaint on September 12, 2014. All of the Defendants moved to dismiss under Rule 23.1 (the "23.1 Motion") and the Pioneer Defendants also moved to dismiss

---

[230] Am. Compl. ¶ 242.
[231] *Id.* ¶ 243.
[232] *Id.* ¶ 244.
[233] *Id.*
[234] *Id.* The Defendants do not dispute denial of the demand for purposes of their Rule 23.1 Motion. *See* Opening Br. in Supp. of Defs.' and Nominal Def.'s Mot. to Dismiss Pursuant to Rule 23.1 at 25 n.15.

under Rule 12(b)(2) (the "12(b)(2) Motion"). I heard oral argument on February 10, 2015 on those motions. For the following reasons, I am granting the Rule 23.1 Motion and dismissing the Complaint. Accordingly, I need not reach the Rule 12(b)(2) Motion.

## II. STANDARD OF REVIEW

Rule 23.1 requires plaintiffs to "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort."[235] Where, as here, a plaintiff has made a demand on the board, the analysis and legal standards applicable are "necessarily different" from the case where a plaintiff is alleging demand would be futile.[236] "A shareholder plaintiff, by making demand upon a board before filing suit, tacitly concedes the independence of a majority of the board to respond."[237] The effect of such concession is that the decision to refuse demand is treated as any other disinterested and independent decision of the board—it is subject to the business judgment rule.[238] Accordingly, for the Court, the "the only issues to be examined are the good faith and reasonableness of its investigation."[239]

---

[235] Ch. Ct. Rule 23.1.
[236] *Levine v. Smith*, 591 A.2d 194, 212 (Del. 1991) *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).
[237] *Id.*
[238] *See id.*; *Spiegel v. Buntrock*, 571 A.2d 767, 775–76 (Del. 1990).
[239] *Levine*, 591 A.2d at 212 (internal quotation marks omitted).

Stated otherwise, to survive a motion to dismiss under Rule 23.1 where demand has been made and refused, a plaintiff must allege particularized facts that raise a reasonable doubt that (1) the board's decision to deny the demand was consistent with its duty of care to act on an informed basis, that is, was not grossly negligent;[240] or (2) the board acted in good faith, consistent with its duty of loyalty. Otherwise, the decision of the board is entitled to deference as a valid exercise of its business judgment. The pleading burden imposed by this standard is a heavy one, and is discussed in more detail below.[241]

Because of the requirement in Rule 23.1 that allegations be pled with particularity, "[v]ague or conclusory allegations do not suffice,"[242] and this Court "need not blindly accept as true all allegations, nor must it draw all inferences from them in plaintiffs' favor unless they are reasonable inferences."[243]

---

[240] *See id.* at 213 ("Reasonableness implicates the business judgment rule's requirement of procedural due care; that is, whether the GM Board acted on an informed basis in rejecting Levine's demand."); *Mount Moriah Cemetery on Behalf of Dun & Bradstreet Corp. v. Moritz,* 1991 WL 50149, at *4 (Del. Ch. Apr. 4, 1991) ("[T]he alleged deficiencies in the Special Committee's investigation must rise to the level of gross negligence if the directors' decision is to be condemned as uninformed."), *aff'd,* 599 A.2d 413 (Del. 1991). The parties also agreed that the "reasonableness" inquiry requires a determination of whether there was gross negligence. *See* Oral Arg. Tr. at 15:15–22, 24:9–15.

[241] *See, e.g., White v. Panic,* 783 A.2d 543, 551 (Del. 2001) ("In the present case, the plaintiff does not contest the Court of Chancery's conclusion that a majority of the ICN directors were disinterested and independent. The plaintiff must therefore carry the 'heavy burden' of showing that the well-pleaded allegations in the complaint create a reasonable doubt that the board's decisions were 'the product of a valid exercise of business judgment.'").

[242] *Postorivo v. AG Paintball Holdings, Inc.,* 2008 WL 553205, at *4 (Del. Ch. Feb. 29, 2008).

[243] *Higher Educ. Mgmt. Grp., Inc. v. Mathews,* 2014 WL 5573325, at *5 (Del. Ch. Nov. 3, 2014).

67

# III. ANALYSIS

## A. Overview

The decision to bring litigation on behalf of a corporation is a quintessential exercise of business judgment, involving as it does a complex array of costs (both monetary and otherwise), potential benefits, and the risk of uncertain outcomes. Under our model of corporate governance, then, the decision to pursue litigation on behalf of the entity is entrusted to the directors, who must approach that decision in light of their fiduciary duties. Only where the directors will not or cannot act in a manner consistent with those duties, may stockholders pursue such litigation derivatively, on behalf of the corporation.

Where, as here, a stockholder makes a demand on the board to consider or bring legal action, the stockholder has necessarily conceded that, at least at this stage of the pleadings, he cannot allege facts showing that the board is disqualified from the decision by self-interest or lack of independence. Where the board considers a demand, and determines that pursuit of the litigation demanded is not in the corporate interest, the stockholder thereafter lacks standing to bring the litigation derivatively, unless the board's refusal is wrongful; that is, the refusal itself is in breach of the directors' fiduciary duties. The burden is on the derivative plaintiff in that case to refute the presumption of a valid exercise of business judgment on the part of the board.

68

In order to survive a motion to dismiss under Rule 23.1 in the demand-refused context, a plaintiff must point to a pleading of particularized facts which, taken as true, raise a reasonable doubt that the refusal was a valid exercise of business judgment. Where the plaintiff has made a demand, and thus conceded that he has no basis to contest the independence of a majority of the board, the only issue subject to challenge is the good faith and reasonableness of the board's investigation of its demand. Where a plaintiff has pled particularized facts which, taken as true, create a reasonable doubt that the board's investigation complied with its duty of loyalty—that is, was undertaken in good faith—or with its duty of care—that is, was not grossly negligent—he has rebutted the business judgment rule with respect to the board's refusal of his demand, and may proceed with the litigation; otherwise, under Rule 23.1, the derivative litigation must be dismissed. Below, I review the Plaintiff's pleadings in light of this standard.

As the painfully extensive statement of facts demonstrates, the Plaintiff wishes to pursue derivatively numerous causes of action; it is not clear as to which of these the Plaintiff contends that the investigation of its demand fell short. Did the Board breach its duties in failing to bring suit against the "Officer/Employee Defendants" for the development of the GAT/RR Stack while certain of those defendants knew the Company's agreement with Monsanto did not allow

commercialization of a stacked product?[244] Did the Board breach its duties in failing to pursue litigation against certain directors for either sanctioning that conduct or consciously failing to investigate it?[245] In the alternative to those two possibilities, did the Board breach a duty in failing to pursue the "Officer/Employee Defendants'" breach of their fiduciary duties for failing to disclose the Monsanto dispute to the Board prior to May of 2009?[246] Did the Board breach its duties in failing to pursue a claim that some of the Defendants breached their fiduciary duties in declining to disclose to the Board the Sanctions Order, prior to November of 2012, subject as it was to a federal protective order?[247] Should the Board have pursued all Defendants' breaches of their fiduciary duties in knowingly disseminating false information during the development of GAT,[248] or for misrepresentation or active concealment?[249] Should they have pursued an equitable fraud claim?[250] What about a waste of corporate assets claim for the settlement of the Monsanto Litigation, which included the RR2 Agreement?[251] Or should the Board have pursued one of the most difficult theories under which to recover in our corporate law—a *Caremark* claim for failure of oversight relating to

---

[244] *See* Am. Compl. ¶ 328.
[245] *Id.* ¶ 327.
[246] *Id.* ¶¶ 333–34.
[247] *Id.* ¶ 338
[248] *Id.* ¶ 343.
[249] *Id.* ¶ 350.
[250] *Id.* ¶ 356.
[251] *Id.* ¶ 358.

70

the development of GAT, statements made thereon, and the Monsanto Litigation?[252]

The gravamen of the Plaintiff's argument, that, in rejecting demands, the board breached its fiduciary duties, is not, specifically, any of the above. It is, in effect, a species of *res ipsa loquitur:* that the attempt to monetize GAT, including by stacking it with Monsanto's RR product, and the resulting litigation and settlement thereof, were so botched, and so costly to DuPont, that *somebody* must be liable for a breach of fiduciary duties, and that liability is so clear and so valuable to DuPont that a decision not to pursue that claim must have been made in bad faith. Counsel for the Plaintiff made this clear when she stated at oral argument, "In my more than 20 years of experience, a sanctions order of this magnitude and a billion dollar verdict and judgment, they don't just happen. They're unusual. They're enough to question whether there is reason to doubt. There is reason to doubt here."[253]

I note that the pertinent "reason to doubt" is *not* doubt about the propriety of the underlying conduct, nor is it doubt about whether the Board, in rejecting the demand, made a wise decision; it is doubt whether the Board's action, wise or foolish, *was taken in good faith and absent gross negligence.*

---

[252] *Id.* ¶ 365.
[253] Oral Arg. Tr. at 51:4–9; *see also id.* at 60:2–21.

71

A derivative plaintiff whose demand has been refused can demonstrate standing under Rule 23.1 in two ways: She can plead particularized facts that reasonably imply gross negligence, in that the board acted in an uniformed manner by failing either to investigate the demand at all or in pursuing such an inadequate investigation, in light of the seriousness of the demand, that a court may reasonably infer a breach of the duty of care.[254] Or, despite the facial independence of the board, she can plead facts that show a board decision so inexplicable that a court may reasonably infer that the directors must have been acting for a purpose unaligned with the best interest of the corporation; that is, in bad faith.

### B. The Board was Adequately Informed

At the time of the initial stockholder demand, the Board had already formed the Committee to examine problems arising from the development of GAT and the Monsanto Litigation. The Committee, comprised of two independent directors whose tenure began after all the underlying malbehavior alleged in the Complaint, was directed by the Board to consider the related Stockholder Demands as well.

---

[254] Gross negligence has been defined as "conduct that constitutes reckless indifference or actions that are without the bounds of reason." *McPadden v. Sidhu*, 964 A.2d 1262, 1274 (Del. Ch. 2008). I note that in considering whether gross negligence has occurred, a court must keep in mind a central tenet of Delaware corporate law, that there is "no single blueprint a board must follow to fulfill its duties," *Barkan v. Amsted Indus., Inc.*, 567 A.2d 1279, 1286 (Del. 1989), including with respect to stockholder demands. *Levine v. Smith*, 591 A.2d 194, 214 (Del. 1991), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000) ("While a board of directors has a duty to act on an informed basis in responding to a demand such as Levine's, there is obviously no prescribed procedure that a board must follow.").

The Committee hired well-regarded independent counsel to assist in its investigation, and over nine months vigorously investigated the circumstances alleged in the Stockholder Demands, including interviewing 23 witnesses, reviewing hundreds of documents, reviewing 25 days of deposition testimony and the entirety of the Monsanto Litigation transcript, and conducting additional research. At the end of this process, the Committee produced the 179-page Report, exclusive of exhibits, which Report recommended remedial procedures in light of its findings but recommended against pursuit of legal action against any current or former directors or officers. This Report, in turn, was considered, and accepted, by the full Board. In light of this background, no successful argument can be made that the Board was uninformed in a manner approaching gross negligence, and thus the Plaintiff is forced to argue bad faith. The Plaintiff's counsel conceded at oral argument that, in light of the facts pled, to successfully defend the Rule 23.1 Motion, rejection of the demand must have been in bad faith.[255]

---

[255] *See* Oral Arg. Tr. at 56:8–58:22. The Plaintiff *does* argue that the Committee should have interviewed the current and former CEOs of DuPont, and, of course, failure to conduct a thorough investigation could, if sufficiently egregious, support a reasonable inference of gross negligence. The allegations with respect to the CEOs are conclusory, however. The Plaintiff does not disclose how the information unique to these individuals can have changed the Board's determination to refuse the demand, in light of the otherwise exhaustive investigation conducted by the Committee and transmitted to the Board. *See Mount Moriah Cemetery on Behalf of Dun & Bradstreet Corp. v. Moritz*, 1991 WL 50149, at *4 (Del. Ch. Apr. 4, 1991), *aff'd*, 599 A.2d 413 (Del. 1991) ("In any investigation, the choice of people to interview or documents to review is one on which reasonable minds may differ. This is especially so in a case such as this, where the challenged conduct covers a period of more than ten years. Inevitably, there will be potential witnesses, documents and other leads that the investigator will decide not to pursue. That decision will not be second guessed by this Court on the showing made here. Plaintiff's

## C. The Board Acted in Good Faith

Demonstrating that directors have breached their duty of loyalty by acting in bad faith goes far beyond showing a questionable or debatable decision on their part. As this Court has observed,

> A failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, where the fiduciary acts with the intent to violate applicable positive law, or where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties.[256]

For the actions of directors to have been in bad faith, the directors must have acted with scienter, *i.e.*, with a motive to harm, or with indifference to harm that will necessarily result from the challenged decision—here, that decision being rejection of the Plaintiff's demand.[257] As former-Chancellor Chandler observed:

> A board may in good faith refuse a shareholder demand to begin litigation even if there is substantial basis to conclude that the lawsuit would eventually be successful on the merits. It is within the bounds of business judgment to conclude that a lawsuit, even if legitimate,

---

complaint establishes that the Special Committee's investigation spanned more than six months.").

[256] *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 755–56 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006).

[257] *See, e.g., In re Goldman Sachs Grp., Inc. S'holder Litig.*, 2011 WL 4826104, at *20 (Del. Ch. Oct. 12, 2011). This Court has also noted the importance of "motive" in this analysis. *See, e.g., In re BJ's Wholesale Club, Inc. S'holders Litig.*, 2013 WL 396202, at *9 (Del. Ch. Jan. 31, 2013) ("As this Court has stated before, 'the absence of an illicit directorial motive and the presence of a strong rationale for the decision . . . makes it difficult for a plaintiff to state a loyalty claim.'"); *In re Novell, Inc. S'holder Litig.*, 2014 WL 6686785, at *7 (Del. Ch. Nov. 25, 2014) ("An analysis of motives is also key to determining whether a fiduciary acted in bad faith. . . . The analysis here centers on whether the Board acted upon some other motive than of advancing the corporation's best interests.").

74

would be excessively costly to the corporation or harm its long-term strategic interests.[258]

Before turning to the specific claims that the Board has forgone, and to whether the allegations in the Complaint provide reason to doubt the Board's good faith in that regard, it is worth examining the large portion of the Plaintiff's argument that goes to disagreement with the conclusions of the Committee. It is clear that mere disagreement with the Committee's ultimate conclusion, as well as its subsidiary conclusions leading thereto, will be insufficient to raise a reasonable doubt that the Board acted in good faith and on an informed basis. The Plaintiff argues, broadly, the Committee's alleged mischaracterization of key facts strips the Board's reliance on the Report of any presumption of proper business judgment. In support of that contention, the Plaintiff cites this Court's decision in *London v. Tyrell*, where this Court found evidence suggesting members of a *special litigation committee* had "prejudged the merits of the suit . . . and then conducted the investigation with the object of putting together a report that demonstrates the suit has no merit," which created "a material question of fact as to the [committee's] independence."[259] But *London* was in the *Zapata* context, in which a derivative suit is brought, demand is excused, and *then* the company attempts to cleanse conflicts by creating a special litigation committee to determine the course of the

---

[258] *In re INFOUSA, Inc. S'holders Litig.*, 953 A.2d 963, 986 (Del. Ch. 2007).
[259] 2010 WL 877528, at *15 (Del. Ch. Mar. 11, 2010); *see also* Answering Br. in Opp'n to Defs.' and Nominal Def.'s Mot. to Dismiss Pursuant to Rule 23.1 at 37.

litigation.[260] In that context, "[u]nlike . . . in the pre-suit demand context," the special litigation committee "bears the burden of demonstrating that there are no genuine issues of material fact as to its independence, the reasonableness of its investigation, and that there are reasonable bases for its conclusions."[261] In the demand-refused context, a board benefits from the *presumption* of a proper exercise of business judgment: only where a board has reason to doubt that a committee's report is a good faith and informed recommendation can I infer breach of duties arising from that board's reliance on the report.[262] In the present case, the Plaintiff alleges that the Board should have reasonably inferred that the Committee ignored or mischaracterized evidence in reaching its conclusion in connection with the underlying Monsanto Litigation. I consider this allegation below.

Specifically, the Plaintiff reserves its strongest condemnation for the Committee's determination that no actionable breach of duty exists in the context of the Sanctions Order. The District Court found that the Company's defense—

---

[260] *See London,* WL 877528, at *11 ("The Supreme Court's decision in *Zapata* governs demand-excused derivative cases in which the board sets up an SLC that investigates whether a derivative suit should proceed and recommends dismissal after its investigation.").

[261] *Id.* at *12, *13. Other *Zapata*-context cases on which the Plaintiff relied include *Sutherland v. Sutherland*, 958 A.2d 235 (Del. Ch. 2008); *In re Oracle Corp. Derivative Litig.*, 824 A.2d 917 (Del. Ch. 2003); *Lewis v. Fuqua*, 502 A.2d 962 (Del. Ch. 1985); and *Kaplan v. Wyatt*, 484 A.2d 501 (Del. Ch. 1984).

[262] *See* 8 *Del. C.* § 141(e) ("A member of the board of directors, or a member of any committee designated by the board of directors, shall, in the performance of such member's duties, be fully protected in relying in good faith upon the records of the corporation and upon such information, opinions, reports or statements presented to the corporation by any of the corporation's officers or employees, or committees of the board of directors, or by any other person as to matters the member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the corporation.").

76

that it understood its contract with Monsanto to permit stacking—was not only untenable, but mendacious, and had worked a fraud on the court. As a result, the District Court sanctioned DuPont, including by shifting Monsanto's attorneys' fees in an amount not disclosed in the record. At the time the Committee considered the matter, the order was on appeal; since the Committee's decision, the appellate court has upheld that part of the Sanctions Order finding vexatious litigation on the part of DuPont, but has overturned the finding of fraud on the court. While the Committee found that the actions of DuPont's counsel underlying the Sanctions Order were within the bounds of good-faith litigation, the Plaintiff argues that something akin to collateral estoppel precludes the Committee from reaching that conclusion, and that the Board, had it been acting in good faith, would have recognized this and accordingly rejected the Report.

The Plaintiff points to *City of Orlando Police Pension Fund v. Page*,[263] a decision by the federal district court for the Northern District of California, as "support[ing] a finding of reasonable doubt about the Board's good faith in relying on a Report that fails to comport with the facts."[264] The Plaintiff relies on *Page* in arguing that the facts in the Sanctions Order, which Order was largely upheld on

---

[263] 970 F. Supp. 2d 1022 (N.D. Cal. 2013).
[264] Answering Br. in Opp'n to Defs.' and Nominal Def.'s Mot. to Dismiss Pursuant to Rule 23.1 at 33.

appeal, cannot be "disavow[ed]" by the Committee.[265] But this contention misses the mark. The Board, through the Committee and its extensive review of the record, informed itself with respect to the Sanctions Order.[266] For me to find that its informed decision was in bad faith, I would have to find that a viable fiduciary duty action exists as a corporate asset, arising from the conduct cited in the Sanctions Order. In other words: (1) that a finder of fact in the theoretical fiduciary duty action contemplated by the demand would, like the District Court,

---

[265] *Id.* In *Page,* as characterized by the Plaintiff,

> the court held that where a committee irrationally rejects plaintiff's claims of underlying wrongdoing as "unsubstantiated," when the company had expressly accepted responsibility for the same wrongdoing through a non-prosecution agreement ("NPA"), a reasonable doubt is created as to the good faith and reasonability of the committee's investigation. Applying the logic of *Page*— where the company admitted liability in order to obtain an NPA, and then the committee denied liability—here, the Company may not deny liability of the officers responsible for the conduct condemned in the Sanctions Order.

*Id.* at 30–31 (citations omitted).

[266] In *Page,* the special committee had not provided a report. The lack of a report, coupled with statements in a demand refusal letter that the court found to be conclusory, raised a reasonable doubt in the court's mind:

> [T]he [demand refusal letter's] sweeping conclusion that "no wrongdoing or culpability occurred," when coupled with the NPA's express "acceptance of responsibility," does create reasonable doubt that the investigation was conducted reasonably and in good faith. To be clear, the court does not opine on the actual merits of the board's decision to refuse plaintiff's demand. It may be true that pursuing litigation was not in Google's best interests, and that demand was properly refused. However, the [demand refusal letter] merely recites the conclusion that refusal was proper without explaining how the committee reached that conclusion. Presumably, the committee report itself does contain a fuller level of detail. But in the absence of the court's or plaintiff's own review of the report itself, the court cannot find that the investigation was conducted reasonably and in good faith. Defendants essentially ask plaintiff and the court, via the [demand refusal letter] to "take their word for it" regarding the thoroughness of the report.

*Page,* 970 F. Supp. 2d at 1031–32.

find the defense in the Monsanto Litigation to have been in bad faith,[267] (2) that the decision to so litigate had been taken in actionable breach of fiduciary duty by a theoretical defendant, and (3) that recoverable damages would have resulted. More fundamentally, I would *then* have to find that the forgoing appears with such clarity, and that the resulting damages were so clearly in excess of risks and costs, that a reasonable doubt exists about the good faith of the Board's refusal to bring the litigation. However, the Plaintiff does not identify just what the breach of duty involved would have been, nor does the Plaintiff identify what the damages would have been, as would make such litigation an irresistible asset for the Company to pursue. Instead, the Plaintiff argues that "[u]nder the circumstances here, the Board acting in good faith could not reasonably determine that the $1 billion verdict and the since-affirmed Sanctions Order are not products of *some* wrongdoing or culpability on the part of *at least some* members of the Board or senior officers of the Company."[268]  In this context, the recommendation by the Committee to forgo fiduciary duty litigation in connection with the Sanctions Order is not so clearly erroneous as to raise a reasonable doubt about the good faith of the Board's reliance on the Report.

---

[267] Or that the finder of fact would be constrained to reach such a conclusion under principles of issue preclusion.

[268] Answering Br. in Opp'n to Defs.' and Nominal Def.'s Mot. to Dismiss Pursuant to Rule 23.1 at 35.

The Plaintiff makes essentially the same argument, with even less persuasive force, with respect to the jury verdict. The jury returned an enormous verdict—over $1 billion—for Monsanto's patent claims, which verdict was pending appeal at the time of settlement. It is not possible, on the facts pled in the Complaint, to determine the ultimate cost to DuPont of this verdict, subsumed as it was in the Settlement, which obviated an appeal, surrendered the anti-trust allegations, settled the litigation, and gave the company new rights to use Monsanto technology, in return for $1.75 billion over ten years. The Committee found the detriment of the jury verdict, in light of the appeal and the Settlement, to be virtually zero. One can dissent from that opinion without doubting the good faith of the Board's decision to rely on the recommendation of the Committee that it was not worthwhile to proceed with fiduciary duty litigation against "at least some" employee or board member, for the reasons discussed above.

While the Plaintiff makes numerous attacks on the methodology and conclusions of the Committee in the Report other than those above, none are of the type that would have been apparent to the Board so as to call into question the Board's good-faith reliance on the Report. I now turn to the specific claims that

80

the Complaint alleges[269] the Board elected to forgo, and whether the facts pled raise a reasonable doubt that those elections were made in good faith.

As noted above, the Committee ultimately concluded that "pursuing the [derivative] claims . . . is not in the best interests of the Company and its shareholders because (1) none of the claims has factual or legal merit; and (2) even if they did, the costs and risks of pursuing litigation far outweigh any potential benefit."[270] The Board adopted that recommendation and declined to pursue fiduciary duty litigation arising out of the development of Optimum GAT as a stand-alone product, the decision to pursue testing and commercialization of the stack, the management of the Monsanto Litigation, the Company's entrance into the RR2 Agreement that was part of the Monsanto settlement, the Company's disclosures relating to Optimum GAT, or the Board's oversight of the Company. The Board's refusal to pursue each of these alleged causes of action is discussed below.

### 1. The Board's Refusal to Pursue the Plaintiff's Counts I and II

In Count I of its Complaint, the Plaintiff alleges breaches of fiduciary duties by the Board in "sanction[ing] the Company's activities" with respect to the

---

[269] The Plaintiff's demand was not part of the record, though the Plaintiff conceded that its demand was "substantially similar" to the December 2012 Stockholder Demand and April 2013 Stockholder Demand. *See* Am. Compl. ¶ 244.

[270] Report at 3.

development of GAT,[271] together with breaches of fiduciary duties by the Officer/Employee Defendants "in the same wrongdoing, both before and after the filing of the Monsanto Litigation."[272] In Count II, asserted as an alternative to Count I, the Plaintiff alleges that the Officer/Employee Defendants breached their fiduciary duties in failing to disclose to the Board "the material facts associated with the GAT stacking strategy and the dispute with Monsanto[] until Monsanto filed suit on or about May 15, 2009."[273]

Count I, insofar as it alleges that the Board was aware of the stacking strategy prior to May 15, 2009, is contrary to the findings in the Report, and, as I have found, the pleadings do not raise a reasonable doubt that the Board relied on the Report in good faith. With respect to the claims in Count I that the Officer/Employee Defendants breached fiduciary duties in connection with both the development of GAT and disclosures related to GAT throughout its development, as noted more fully above, the Committee concluded that management had "relied upon . . . formalized business level processes (including Stages & Gateways) to ensure oversight of product development and input of appropriate personnel, including business leaders, scientists and Legal."[274] Overall, the Committee concluded "that management's decisions related to

---

[271] Am. Compl. ¶ 327. To the extent that Count I attempts to state a *Caremark* claim against the Board, that claim is examined below.

[272] *Id.* ¶ 328.

[273] *Id.* ¶ 332.

[274] Report at 133.

Optimum GAT were reasonable and must be analyzed in the overall context of the product development process," which it characterized as, "by its very nature, inherently uncertain."[275] The Committee ultimately found that, "at each juncture, management engaged in a thorough analysis of whether to continue developing Optimum GAT as a standalone product and, given the potential benefits of the product, made reasonable decisions, acting in good faith, based on this analysis."[276] The Board's decision to decline to pursue a breach of fiduciary duty claim for the development of GAT was informed and cannot be said to have been in bad faith. Moreover, and in light of the Committee's findings referenced above, the Plaintiff has also failed to raise a reasonable inference that the Board acted in bad faith in declining to pursue vague fiduciary duty claims against employees for failure to timely inform the Board about problems with developing GAT.

### 2. The Board's Refusal to Pursue the Plaintiff's Count III

The Board also declined to pursue a breach of fiduciary duty claim against Kullman, Borel, Sager, Schickler, McKay, and. E. du Pont for failure to disclose the Sanctions Order to the rest of the Board prior to November 16, 2012 when it was unsealed by the District Court. The Plaintiff alleges that the basis for the Sanctions Order was a number of internal DuPont documents, and that Kullman

---

[275] *Id.* at 134.
[276] *Id.* at 135. As noted above, the Report also considered and rejected a waste claim for similar reasons. *See id.* at 135–36.

and Sager should have "shared the sum and substance of the Sanctions Order with at a minimum an independent director, if not the full Board, even if a copy of the Sanctions Order could not be disseminated without the approval of the Court in the Monsanto Litigation."[277] But the Board can hardly be said to have acted in bad faith in failing to pursue a fiduciary action against Kullman, Borel, Schickler, McKay, and E. du Pont for abiding by the confidentiality directive imposed by the District Court, which had just *sanctioned* the Company. Even if it had been a breach of fiduciary duty not to disclose the sealed Sanctions Order, it is not clear that there would be damages for such a breach, let alone the potential for damages so compelling that I may infer bad faith from a refusal to bring the action. In other words, even if a viable fiduciary duty claim exists, and even if that claim portends cognizable damages (of which I am skeptical), there is no reasonable indication that the decision not to pursue litigation on such a theory was in the interest of something other than that of the corporation, sufficient to imply bad faith on the part of the Board.

### 3. The Board's Refusal to Pursue the Plaintiff's Counts IV, V, and VII

In Count IV, the Plaintiff asserts claims against the Officer/Employee Defendants and the Director Defendants for "knowing dissemination of false information [which] caused injury, including reputational injury, to the Company

---

[277] Am. Compl. ¶ 301.

84

and damage to the stockholders."[278]  In Count V, the Plaintiff alleges that the Officer/Employee Defendants and the Director Defendants "communicated with the stockholders regarding GAT, GRS and the Company's license rights from Monsanto, and did so knowing that their communications were false or made such communications with reckless indifference to the truth,"[279] also taking "affirmative action designed or intended to prevent the discovery of the truth regarding GAT, GRS and the Company's license rights with Monsanto."[280]  In Count VI, the Plaintiff alleges that the Director Defendants and the Officer/Employee Defendants "either affirmatively disseminated false information or negligently failed to cure misleading information known to be false in the face of a duty to speak," and that they also "took affirmative action designed or intended to prevent the discovery of the truth regarding GAT, GRS and the Company's license rights with Monsanto both inside and outside the Company."[281]

As detailed above, the Committee considered disclosures about GAT in three time periods, including many of the same disclosures the Plaintiff here alleges,[282] and concluded that none of them were false or misleading and, thus, would not give rise to a breach of fiduciary duty on the part of those involved in making the statements.  Again, that the Plaintiff disagrees with the Committee's

---

[278] *Id.* ¶ 343.
[279] *Id.* ¶ 346.
[280] *Id.* ¶ 347.
[281] *Id.* ¶ 355.
[282] *See supra* note 206.

conclusions is simply insufficient to raise a reasonable doubt that the Board's adoption of the Committee's recommendation was made in good faith, and the Plaintiff has made no other proffer as to why the decision to decline to pursue litigation on this claim must be in an interest other than that of the corporation.

### 4. The Board's Refusal to Pursue the Plaintiff's Count VII

In Count VII, the Plaintiff alleges a waste of corporate assets by the Officer/Employee Defendants and the Director Defendants relating to the development of GAT, the Monsanto Litigation, and the Settlement "for hundreds of millions more than [the Company] would have had to pay for license rights prior to the Monsanto Litigation."[283]

The Committee's conclusions with respect to a waste claim for pursuing a stacked product, for the conduct of the Monsanto Litigation, including the Sanctions Order, and for entering the Settlement, are set forth above, and more fully in the Report. In short, the Committee detailed that the development of the stacked product involved consultation with counsel, both inside and outside the Company; that throughout the course of the Monsanto Litigation, counsel acted in good faith; that the Committee reached this conclusion despite the Sanctions Order, which the Committee closely examined and found not to be a basis for fiduciary duty claims against the individuals involved; and that the Settlement

---

[283] Am. Compl. ¶ 358; *see also id.* ¶ 359.

involved a reasonable exchange of value. The Plaintiff fails to allege anything other than conclusory allegations contrary to the findings set forth by the Committee in an unsuccessful attempt to raise a reasonable doubt about the Board's good faith in declining to pursue a waste claim.

### 5. The Board's Refusal to Pursue the Plaintiff's Count VIII

Finally, in Count VIII, the Plaintiff alleges *Caremark* claims against the Director Defendants, either for "failure to institute and maintain adequate internal controls over the Company's information and reporting systems and to make a good faith effort to correct or prevent the deficiencies and problems caused thereby," or for the conscious failure "to monitor or oversee existing systems and operations thereby disabling themselves from being informed of risks or problems requiring their attention."[284] The Plaintiff's *Caremark* claims related to the Monsanto dispute as well as the alleged misstatements made to stockholders and the public relating to GAT and the Company's rights to develop the GAT/RR Stack.

The Committee's findings on the *Caremark* claims are, again, outlined above and more thoroughly detailed in the Report. The Committee noted, as do I, that *Caremark* claims are among the most difficult theory a stockholder plaintiff can undertake. The Committee found that the Company's internal control

---

[284] *Id.* ¶ 365.

87

systems—which, whether or not operating as designed, certainly existed—not sufficiently deficient so as to satisfy the first prong of *Caremark*, and that there were no "red flags" that would enable a finding that the Board consciously failed to monitor those controls, as required by the second prong of *Caremark*.[285] Once again, the Plaintiff disagrees with the conclusions of the Committee.

The Plaintiff, recognizing that convincing this Court that a disinterested decision to forgo a *Caremark* claim implicates bad faith is a tough row to hoe, cleverly (but unpersuasively) attempts to depict the breach of duty regarding internal controls as a coin flip with both sides heads: either the Board had established no information or reporting system, making the directors liable under *Caremark*, or employees with fiduciary duties must have failed to comply with that system, making them liable for breaches of those duties. Demonstrating that a business plan or system has failed is not the same as demonstrating an actionable breach of fiduciary duty, however. The Committee informed itself about the *Caremark* claims and did not find an actionable breach of duty worth pursuing; nothing about the Board's acceptance of this recommendation implies bad faith.

*D. Concluding Thoughts*

The facts pled indicate that the development of GAT and the Monsanto Litigation were failures, causing DuPont (and its stockholders) to incur substantial

---

[285] *See Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006).

losses. The question here is not whether these losses in fact occurred, or even whether, assuming they did, the individuals responsible for those losses could be liable to the Company for breaches of fiduciary duties; the Board here examined these allegations and determined that it was not in the Company's interest to pursue litigation. The entire foundation of the demand requirement is that litigation on behalf of the corporation belongs to the corporation, which is managed by the board.[286] It is up to an informed and independent board to determine whether potential litigation has merit and whether the costs of that meritorious litigation are outweighed by the probable benefits of potential recovery.

As noted, the Plaintiff made a demand on the Board, thus conceding, at least *ex ante*, that the Board was capable of exercising its business judgment in considering that demand, *i.e.*, that the Board was disinterested and independent.[287] The Plaintiff also does not challenge, *ex post*, the Board's interest or

---

[286] *Aronson v. Lewis*, 473 A.2d 805, 813 (Del. 1984) *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000) ("The thrust of *Zapata* is that in either the demand-refused or the demand-excused case, the board still retains its Section 141(a) managerial authority to make decisions regarding corporate litigation."); *Spiegel v. Buntrock*, 571 A.2d 767, 775 (Del. 1990) ("The effect of a demand is to place control of the derivative litigation in the hands of the board of directors.").

[287] Am. Compl. ¶ 18.

independence.[288]  Nor can the Plaintiff reasonably challenge that the Board informed itself through the work of the Committee.

The Plaintiff disagrees with the Committee's conclusions, particularly those contrary to the findings in the Sanctions Order.  But a disagreement, however vehement, with the *conclusion* of an independent and adequately represented committee is not the same as pleading particularized facts that create a reasonable doubt that the Board acted in what it perceived as the best interests of the corporation.

The question is not whether the conclusion was wrong; the question is whether the Board was grossly negligent in failing to inform itself, or intentionally acted in disregard of the Company's best interests in deciding not to pursue the litigation the Plaintiff demanded.  I cannot find that the Plaintiff has raised a reasonable doubt that the Board acted in an informed manner and in good faith.

I note that some of the individual defendants have raised jurisdictional challenges, as well as joining in the Rule 23.1 Motion addressed here.  I would normally decide jurisdiction first, but since, in the alternative, the Plaintiff has requested additional jurisdictional discovery, judicial economy dictated resolution

---

[288] *See, e.g.,* Oral Arg. Tr. 17:14–23; *Emerald Partners v. Berlin*, 2003 WL 21003437, at *43 (Del. Ch. Apr. 28, 2003) ("It is settled Delaware law that a party waives an argument by not including it in its brief."), *aff'd*, 840 A.2d 641 (Del. 2003).

90

of the Rule 23.1 Motion. Because I am granting that Motion and dismissing this action, I need not reach the jurisdictional questions.

## IV. CONCLUSION

For the foregoing reasons, I grant the Defendants' Motion to Dismiss under Rule 23.1. An appropriate order accompanies this Memorandum Opinion.

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IRONWORKERS DISTRICT )
COUNCIL OF PHILADELPHIA & )
VICINITY RETIREMENT & PENSION )
PLAN, )
              Plaintiff, )
         )
      v. ) C.A. No.9714 -VCG
         )
LAMBERTO ANDREOTTI, et al., )
         )
        Defendants. )

## <u>ORDER</u>

AND NOW, this 8th day of May, 2015,

The Court having considered the Defendants' Motions to Dismiss under Rule 23.1 and Rule 12(b)(2), and for the reasons set forth in the Memorandum Opinion dated May 8, 2015, IT IS HEREBY ORDERED that the Motion to Dismiss pursuant to Rule 23.1 is GRANTED and the Plaintiff's Complaint is dismissed with prejudice.

SO ORDERED:


<u>/s/ Sam Glasscock III</u>

Vice Chancellor